DORTCH ET AL. *v.* LUGAR ET AL.

[No. 770S149. Filed January 26, 1971. Rehearing denied March 22, 1971.]

*Erle A. Kightlinger, Mark W. Gray, Howard J. DeTrude, Jr., Kightlinger, Young, Gray & Hudson, Nelson G. Grills,* of Indianapolis, for appellants.

*Harry T. Ice, Robert D. Risch, George B. Gavit, Ice, Miller, Donadio & Ryan, Harold H. Kohlmeyer, Jr.,* Corporation Counsel, of Indianapolis, for appellees.

HUNTER, J.—Pursuant to the provisions of Indiana's Public Lawsuit statute (Ind. Ann. Stat. § 3-3301—3-3308 [1968 Repl.]),[1] plaintiff-appellant (hereinafter referred to as appellant) and intervening plaintiff-appellant (hereinafter referred to as intervenor) brought this suit challenging the constitutionality of Chapter 173 of the Acts of 1969, common-

---

1. Acts of 1967, ch. 357, Sec. 1-8; IC 1971, 34-4-17-1—8.

ly referred to as the "Unigov" bill.[2] The Act purports to reorganize local municipal and county government in counties containing a city of the first class to enable the consolidation of governmental functions in densely populated metropolitan communities, thus eliminating the overlapping jurisdictions of various county and municipal boards and departments, and to provide some semblance of centralized control over the metropolitan area.

The cause went to trial upon stipulated facts submitted by the parties and the trial court, upon an examination of the evidence, briefs and arguments of counsel, found the Act to be constitutional and valid in all respects.

Numerous issues have been raised for our consideration on appeal questioning the basic governmental framework resulting from the Act's provisions and involving the application of several sections of our constitution. In the interests of brevity, we have attempted to organize and consolidate our discussion of points argued by both appellant and intervenor where those arguments presented are substantially the same.

Appellant first contends that the title to Chapter 173 violates the mandate of Art. 4, § 19, of the Indiana Constitution in that it is not sufficiently broad to cover the subject matter contained in the Act. The pertinent provision of Art. 4, § 19, reads as follows:

"Every act, amendatory act or amendment of a code shall embrace but one subject and matters properly connected therewith; which subject shall be expressed in the title. But if any subject shall be embraced in an act, amendatory act or amendment of a code, which shall not be expressed in the title, such act, amendatory act or amendment of a code shall be void only as to so much thereof as shall not be expressed in the title . . ." Ind. Const. Art. 4, § 19.
The title to chapter 173 is worded thus:
"AN ACT concerning reorganization of government in counties containing a city of the first class." Acts of 1969, ch. 173, p. 357.

2. Ind. Ann. Stat. §§ 48-9101—48-9507 (1970 Supp.); IC 1971, 18-4-1-1—18-4-5-4.

It is argued that the Act *establishes* or *creates* a new class of municipal corporations to be known as "consolidated cities" and that the words "reorganization of government in counties containing a city of the first class" neglects to describe the far-reaching quality of the Act in reorganizing the government of first class cities and destroying that class as municipal corporations, except as that class is used to determine the new class of consolidated cities.

As was recently stated in the case of *State ex rel. Indiana Real Estate Comm.* v. *Meier* (1963), 244 Ind. 12, 190 N. E. 2d 191, Art. 4, § 19, was primarily designed for those titles which are narrower in scope than the actual enactment. The purpose of the provision has been recognized as two fold: first it is intended to prevent surprise or fraud by inclusion in the body of a bill matter of which the title gives no indication and which would fail to apprise the Legislature and the people as to the subject of legislation enacted or under consideration; and secondly to prevent a combination of non-related subjects in the same act. *Indiana Real Estate Comm.* v. *Meier, supra; State ex rel. Penn. R.R. Co.* v. *Iroquois Conservancy District Court* (1956), 235 Ind. 353, 133 N. E. 2d 848; *Albert* v. *Milk Control Board of Indiana* (1936), 210 Ind. 283, 200 N. E. 688. To satisfy the requirements of Art. 4, § 19, it is not necessary that the title of an act amount to an abstract of its contents, but only that it fairly give notice of the legislative matter contained therein. *Martin* v. *Ben Davis Conservancy District* (1958), 238 Ind. 502, 153 N. E. 2d 125; *Board of Comm. of County of Marion* v. *Scanlan* (1912), 178 Ind. 142, 98 N. E. 801. In applying this constitutional provision, we are permitted to indulge in a very liberal interpretation rather than a critical and strict construction calculated to defeat the act. *Perry Township of Marion County, Indiana* v. *Indianapolis Power & Light Co.* (1946), 224 Ind. 59, 64 N. E. 2d 296; *DeHaven* v. *Municipal City of South Bend* (1937), 212 Ind. 194, 7 N. E. 2d 184.

With these principles in mind, it is our conclusion that the phrase "reorganization of government in counties containing a city of the first class" is sufficiently broad to apprise of the nature of the Act's contents. As noted by appellee, reorganize is defined to mean "to organize again or anew; change the organization of". Webster's New Third World Dictionary, 1923 (1961). Clearly that is precisely what the Act here in question accomplishes—the reorganization of local government for the purposes of consolidating the governmental functions of a county and first class city therein situated. To hold that the Act's title is not sufficiently descriptive of its contents in this case would be placing an undue premium on sheer technical semantics as opposed to substantive meaning.

Appellant next asserts that the Act is violative of Art. 4, §§ 22 and 23, in that the law is special in character; a similar argument is advanced under Art. 11, § 13, by appellant's contention that the Act creates a corporation by special act. In each instance, appellant points to the fact that the Act, by its very terms, can apply only to Marion County and is therefore "special".

As to appellant's argument under Art. 4, §§ 22 and 23, it is there noted that the Act directly affects at least six of the areas enumerated in Art. 4, § 22, to wit: for the punishment of crimes and misdemeanors; for laying out, opening and working on highways, and for the election or appointment of supervisors; vacating roads, town plats, streets, alleys and public squares; regulating the election of county and township officers and their compensation; and for the assessment and collection of taxes for state, county, township or road purposes.

The thrust of appellant's objection to the Act in this regard is that the law, affecting the above named areas, can apply only to Marion County because of the current population densities persisting throughout the state in the various counties. As a general proposition, however, it is sufficient for purposes of §§ 22 and 23 of Art. 4 of the act

in question treats all persons alike under the same or similar conditions and circumstances, and the classification is reasonable and naturally inherent in the subject matter. *Bennett* v. *Spencer County Bridge Comm.* (1938), 213 Ind. 520, 13 N. E. 2d 547; *Kelly* v. *Finney* (1935), 207 Ind. 557, 194 N. E. 157.

Chapter 173, by its very terms, is made applicable to any county in which, because of later increased population, there is situated a city of the first class. Acts of 1969, ch. 173, §§ 102, 1502. The mere fact that no other county presently qualifies does not render the Act unconstitutional. *Groves* v. *Board of Comm. of The County of Lake* (1936), 209 Ind. 371, 199 N. E. 137; *Campbell* v. *City of Indianapolis* (1900), 155 Ind. 186, 57 N. E. 920. As was said in the *Groves* opinion:

"If the act is broad enough to apply to all counties of the state under the same circumstances, it cannot be condemned." *Groves* v. *Board of Comm. of Lake County, supra,* 209 Ind. at 376, 199 N. E. at 140.

That legislative classifications may be based on population has already been established by this court as long as the classification results in a uniform operation of the law throughout the state. *Evansville-Vanderburgh Levee Authority District* v. *Kamp* (1960), 240 Ind. 659, 168 N. E. 2d 208; *State ex. rel. Gannon* v. *Lake Circuit Court* (1945), 223 Ind. 375, 61 N. E. 2d 168; *Millers National Insurance Co.* v. *American State Bank of East Chicago* (1934), 206 Ind. 511, 190 N. E. 433. If population alone is to be the basis for the classification, nevertheless, as is here the case, it must bear some rational relationship to the subject dealt with and must be based on justifiable distinctions when considered in the context of the legislative goal sought to be obtained. *Evansville-Vanderburgh Levee Authority Dist.* v. *Kamp, supra; Perry Civil Township of Marion County* v. *Indianapolis Power and Light Co.* (1943), 222 Ind. 84, 51 N. E. 2d 371; *Groves* v. *Board of Comm. of Lake County, supra.*

We hold that the legislative qualification in the Act stipulating that there be one first class city in the county before the Act becomes effective as to that county is not an unconstitutional classification. Clearly, the population count of a city within the county has a distinct and rational relationship to the subject of the legislation, namely the reorganization of county and city government in such a populated county. Distinguishing between such a county and one with no first class city is justifiable when considered in light of the goal sought by the Legislature.

The fact that the Act was drafted with Indianapolis and Marion County in the minds of legislators, a fact of which we take judicial cognizance, does not, of itself, put it without the constitutional provisions of Art. 4, §§ 22 and 23, there being sufficient legislative reason to distinguish on the basis of population, and there being provision made for the application of the Act to all counties that should so qualify.

Likewise the Act does not stand in violation of Art. 11, § 13, providing that corporations shall not be created by special act. Appellant makes substantially the same argument as under Art. 4, § 23, above discussed. Although the provisions of Art. 11, § 13, have been held to apply to municipal corporations as long ago as 1885, *Corporation of Bluffton* v. *Studebaker* (1885), 106 Ind. 129, 6 N. E. 1; the case of *Bailey* v. *Evansville-Vanderburgh Airport Authority* (1960), 240 Ind. 401, 166 N. E. 2d 520, amply demonstrates that, given the nature of appellant's argument as to the Act's special character, essentially identical considerations become pertinent as under Art. 4, § 23. Consequently, we need not repeat our previous discussion here.

Appellant's third contention is that the Act violates the provisions of Art. 15, §§ 1 and 2, of the Indiana Constitution which provide:

"All officers, whose appointment is not otherwise provided for in this Constitution, shall be chosen in such manner

as now is, or hereafter may be, prescribed by law." Ind. Const. Art. 15, § 1.

"When the duration of any office is not provided for by this Constitution, it may be declared by law; and, if not so declared, such office shall be held during the pleasure of the authority making the appointment. But the General Assembly shall not create any office, the tenure of which shall be longer than four years." Ind. Const. Art. 15, § 2.

The specific section of the Act thought violative of the above-quoted provisions reads as follows:

"Interim Mayor, Clerk and City-County Council. Until the Mayor and City-County Council first elected pursuant to this Act take office: the Mayor of the First Class City shall be the Mayor of the Consolidated City; the City Clerk of the First Class City shall be the Clerk; and the City-County Council shall consist of the members of the Common Council of the First Class City and the County Council of the County, each member with equal voting rights; and the members of any Special Service District Council shall consist of the members of the Common Council of the First Class City." Acts of 1969, ch. 173, § 310 (Ind. Ann. Stat. § 48-9201, n. [1970 Supp.]).

Appellant notes that under Section 310, it is possible that members of the pre-existing county or city councils will continue in office for an additional period of time pending election of the newly constituted City-County Council, notwithstanding the absence of a provision specifying that they shall hold office until their successors are elected and qualified. The conclusion reached by appellant is that the councilmen's terms of office are thereby extended in violation of Art. 15, § 2. In other words, since the Act does not treat the councilmen as "hold-overs" but rather treats them as continuing officeholders, it, in effect, extends their terms beyond the constitutional limit.

Appellant continues in the alternative by asserting that if the Act is construed to not extend the terms of office, but rather to abolish them with automatic appointment to newly created offices, to wit: offices of City-County Councilmen, the Act would then violate Art. 15, § 1, of the Indiana Constitution

prohibiting appointment by the Legislature of municipal officers, citing *State ex rel. Jameson* v. *Denny, Mayor* (1888), 118 Ind. 382, 21 N. E. 252.

Neither argument is persuasive. It is our considered opinion that the Act was clearly intended to treat the incumbent councilmen as "hold-overs" until the officers of the consolidated city can be duly elected and qualified as therein provided. Appellant fails to cite a case, nor have we been able to discover one, which holds that the specific term "hold-overs" must be used to characterize the nature of an officeholder's tenure who holds an office awaiting the election and qualification of an individual to a newly created statutory office. To say, as appellant does, that the Act treats such councilmen as "continuing officeholders" rather than "hold-overs" is, under the terms of the Act, to make a distinction without a constitutional difference. As provided by Art. 15, § 3:

> "Whenever it is provided in this Constitution, or in any law which may be hereafter passed, that an officer, other than a member of the General Assembly, shall hold his office for any given term, *the same shall be construed to mean,* that such officer shall hold his office for such term, *and until his successor shall have been elected and qualified.*" (our emphasis) Ind. Const. Art. 15, § 3.

In a transitional period, such as we have under the provisions of ch. 173, it seems readily apparent that the same considerations are pertinent as in the situation where the Legislature has merely postponed the time for holding the elections of certain officers. In the case of *Spencer* v. *Knight* (1912), 177 Ind. 564, 98 N. E. 342, it was said:

> ". . . the general rule is that it is within the province of the legislature to postpone elections and readjust the commencement of the terms of offices *such as are of legislative creation particularly,* in which case the incumbents may either hold over, or special elections may be authorized to fill the vacancies thus occasioned until the next general election. Such statutes are not considered in violation of the Constitution, where the object is to regulate the time of holding elections, and not merely to extend the terms

of incumbents; but if the legislative intent is clearly to extend the terms of present incumbents in office, the act will fall under the ban of the constitutional provision." 177 Ind. at 576, 98 N. E. at 346.

There is nothing in the record nor argument of appellant which would indicate that the Legislature "clearly intended" to specifically extend the terms of those individuals subject to Section 310, nor would we be justified in drawing such an inference. Rather, the Section appears to be a justifiable solution to the transitional problems presented by the Act and thus suffers from no constitutional infirmity.

Having thus determined that Section 310 of ch. 173 may properly be construed to characterize the incumbent officers as "holdovers" within the provisions of Art. 15, § 3, we need not consider appellant's alternative argument relating to the unlawfulness of "appointing" municipal officers, there being, in fact, no "appointment" here.

Intervenor also makes a brief argument relative to Section 310 of ch. 173 which might appropriately be discussed here. It is his contention that Section 310 violates Art. 3, § 1, of the Indiana Constitution providing for the separation of powers into the three separate branches of government, the Legislative, Executive and Judicial. Intervenor's theory apparently is that Section 310 constitutes a legislative appointment of officers of local government, thus violating the rule of *State ex rel. Jameson* v. *Denny, supra*. We have, however, already commented on the applicability of that case as it relates to Section 310 and deem no further discussion to be required.

Appellant's next argument also pertains to the provisions of Art. 15, § 3, by his assertion that the Mayor and city and county councilmen become officers of the consolidated city, and commence their terms of office as such officers while the terms for which they have been elected as officers of the pre-existing city and county governmental units are "interrupted" before their "given terms"

expire. Since, appellant continues, the officers have, under the Act, "abandoned" their terms of office and the offices to which they were elected, they are not "holding office for the terms for which they were elected," and they are not holding their offices until their successors are elected in violation of the constitutional provision above referred to.

From the foregoing, it is apparent that appellant would have us construe the language of Art. 15, § 3, as a constitutional directive requiring of the Legislature that each elected officer be permitted to serve his full elective term with no right residing in the Legislature to terminate or alter said terms. This court, nevertheless, has previously determined that statutorily created officers are creatures of the Legislature and subject to its will:

> "Offices are neither grants nor contracts nor obligations which can not be changed or impaired. They are subject to the legislative will at all times, except so far as the Constitution may protect them from interference. Offices created by the Legislature may be abolished by the Legislature. The power that creates can destroy. The term of an office may be shortened, the duties of the office increased, and the compensation lessened, by the legislative will." *State ex. rel. Yancey* v. *Hyde* (1891), 129 Ind. 296, 302, 28 N. E. 186, 187-88.

For an application of this principle to a municipal officer, see *Rogers* v. *Calumet National Bank of Hammond* (1938), 213 Ind. 576, 12 N. E. 2d 261.

Appellant next, joined by intervenor, challenges those provisions of ch. 173 which exclude any city or town situated in the county which has a population in excess of five thousand (5,000) while including other towns within the new governmental unit on the grounds that such a classification is unreasonable under Art. 4, § 23, and that it violates the privileges and immunities clause of Art. 1, § 23.

It is not our intention or function to pass upon the wisdom of the Legislature in its classification of excluded and included cities and towns:

"The desirability, or need for legislation is entirely for the legislature to determine. The question of its wisdom in adopting a classification is a matter of no concern to the courts. The courts may determine only whether the classification is founded upon the substantial distinctions in the subject matter . . ." *State* v. *Griffin* (1948), 226 Ind. 279, 288, 79 N. E. 2d 537, 542.

Further, it is the duty of this court, in construing the constitutionality of a statute, to adopt a construction upholding the statute's constitutionality where it is possible for us to do so. *Evansville-Vanderburgh Levee Authority Dist.* v. *Kamp, supra; Bally* v. *Guilford Township School Corp.* (1954), 234 Ind. 273, 126 N. E. 2d 13; *Zoercher* v. *Agler* (1930), 202 Ind. 214, 172 N. E. 186; *Thorlton* v. *Guirl Drainage Co.* (1916), 184 Ind. 637, 112 N. E. 5.

Both appellant and intervenor argue that the classification of excluded and included cities and towns is based solely upon a difference in population, when in fact both classes have the same inherent needs and qualities. Appellant also makes reference to the political expediencies which, in his opinion, dictated the legislative classification ultimately settled upon. There being nothing in the record to substantiate this speculation, however, we shall give it no further consideration.

Turning then back to the classification of excluded and included cities and towns fixed on a population count of five thousand persons, we would admit that the classification might, at first glance, appear to be somewhat arbitrary in nature; it would nevertheless seem evident that such a classification might reasonably have been premised on a justifiable distinction inherent in the subject matter under consideration, namely that cities and towns with a population in excess of five thousand persons are of sufficient size to provide efficient, viable and responsive local government as an independent unit within the consolidated city. As was said in *Kamp, supra:*

"There are many cases in Indiana which hold that population is a valid basis for classification. This is particularly true with reference to legislation pertaining to governmental

organization and operation, *since the size of the govern-
mental unit has an important bearing on how its operation
shall be performed, as well as its efficiency. In all classifica-
tions made by population there is always some element of
arbitrariness.* Yet the presence of such element does not
make the legislation special if there still remains some
relationship between such classification and the objective
of the law which the legislature could have considered
to exist." (our emphasis) *Evansville-Vanderburgh Levee
Authority Dist.* v. *Kamp, supra,* 240 Ind. at 663, 168 N. E.
2d at 210.

The legislative objective sought, as manifested by the title
to the Act, is the reorganization of government in counties
containing a city of the first class. The exclusion of existing
cities and towns with a population in excess of five thousand
persons, situated within the county, was not constitutionally
inappropriate when considered in the context of how best to
reorganize county and city government, as is here sought to
be accomplished. For us to otherwise hold would be to second-
guess the Legislature and to substitute our own judgment as
to how best local government might be reorganized.

Appellant and intervenor cite the case of *Heckler* v. *Conter*
(1933), 206 Ind. 376, 187 N. E. 878 to substantiate their
claim that the classification of excluded and included cities
and towns is unreasonable. The Act there being challenged
provided that in all second and fourth class cities located
in a county having a population of not less than two hundred
fifty thousand (250,000) nor more than four hundred thou-
sand (400,000), the office of city treasurer was abolished and
all of the rights, powers and duties of such city treasurer were
conferred upon and were to be performed by the county treas-
urer. This court there concluded:

"The law is clearly local and special. There is no difficulty
in conceiving of a general law that would accomplish the
same end in the cities affected by this law, and in all other
cities in like situation. *The fact that they are located in a
county with a population of not less than two hundred fifty
thousand nor more than four hundred thousand cannot
possibly account for any difference in situation in respect*

*to the need of a city treasurer or the propriety of the county treasurer acting as such.*

. . .

. . . we are unable to see how the fact that a city of a second class or fourth class happens to be located in a county with a population between two hundred fifty thousand and four hundred thousand can possibly affect the necessity or expediency of its maintaining a city treasurer." (our emphasis) *Heckler* v. *Conter, supra,* 206 Ind. at 382-84, 187 N. E. at 880.

The distinction between the case at bar and *Heckler* is apparent. We have already stated our conclusion that the classification of excluded and included cities and towns bears a rational and legitimate relationship to the legislative goal of providing consolidated city and county government.

It is further argued by appellant in this regard that the fragmentation resulting from the exclusion of certain cities and towns within the geographical boundaries of the consolidated city frustrates the basic objective of the Act, namely the integration of governmental functions within a metropolitan community. As we stated at the outset of this discussion, nevertheless, we will not interpose our opinion in place of the Legislature's as to how best they might have accomplished their objective; rather we would reflect the sentiment of the United States Supreme Court in that we will not operate as a "roadblock in the path of innovation, experiment and development among units of local government" faced with the task of dealing with immense pressures and greatly varying problems, so long as there is no manifest perversion of our constitutional provisions. See *Avery* v. *Midland County, Texas* (1968), 390 U. S. 474, 20 L. Ed. 2d 45.

Intervenor points to the town of Cumberland as demonstrative of the unreasonableness with which excluded and included cities and towns are classified. It is pointed out that because Cumberland lies on the border of Marion and Hancock Counties, part of the town's citizens are subject to the provisions of ch. 173 and part are not. This fact does not constitute a legal

basis for invalidating the Act. As appellee points out, prior to the Act a similar problem existed in that the residents of Cumberland were subject to the different county jurisdictions. The Act does not change that status but only provides that those residents of Cumberland living in Marion County become citizens of the consolidated city as opposed to being subject to the previously-existing Marion County governmental unit.

Appellant's next assertion of unconstitutionality also involves the "excluded city" concept. Both appellant and intervenor argue that the Act, providing that citizens of excluded cities and towns have the right to vote for their own municipal officers, as well as the Mayor, Councilmen-at-Large and Councilman from their respective Councilmanic District of the consolidated cities is violative of Art. 1, § 23, in that it extends unequal voting privileges to citizens of excluded cities and towns when compared to those extended to citizens of the consolidated city.

A brief recital of the pertinent statutory provisions may be helpful. First, the Act provides that the Mayor of the consolidated city shall be elected by all of the voters of the consolidated city and the county voting for such office. Acts of 1969, ch. 173, § 301. The Mayor is to be the chief executive and administrative officer of the consolidated city with the power to supervise the work of its departments, special taxing districts and special service districts. Acts of 1969, ch. 173, § 401. A twenty-nine (29) member City-County Council is also provided for which is to operate as the primary legislative body of the consolidated city and county. Acts of 1969, ch. 173, §§ 306, 404. Its powers are enumerated at Section 404 of the Act and include generally the power to adopt budgets, levy taxes, make appropriations and adopt resolutions or ordinances necessary to the exercise of such powers. Four (4) members of the Council are elected from the county-at-large with the remaining twenty-five (25) elected individually from single-member electoral districts as equal as practicable in population. Acts of 1969, ch. 173, §§ 306, 308.

The objection to the plan, as we understand the briefs of appellant and intervenor, is that by allowing citizens of excluded cities and towns to vote at the election of the consolidated city officers, the vote of citizens of the consolidated city is to that extent diluted. To state the objection another way, why should one excluded from constituency in the consolidated city be allowed to cast a vote of the same importance and impact as his neighbor who is a citizen of the consolidated city?

We note that citizens of the excluded cities and towns *are* constituents of the consolidated city insofar as they are directly affected by actions taken by the Mayor, City-County Council and the various departments of the consolidated city. That they are so affected may be demonstrated by an analysis of the provisions relating to creation, organization and powers of the Department of Public Works. The Department of Public Works illustrates, we feel, the nexus existing between citizens of excluded cities and towns and the Mayor and City-County Councilmen elected by the vote of all citizens of the County.

The chief administrative officer of the Department of Public Works is a Director (Acts of 1969, ch. 173, § 901), appointed by the Mayor upon approval by a majority of the City-County Council (Acts of 1969, ch. 173, § 304). The Department includes a Board of Public Works, comprised of five members— the Director, two board members appointed by the Mayor and two appointed by the City-County Council (Acts of 1969, ch. 173, § 312), which has the power to review all budgets prepared by or proposed for the Department; to hold any hearings, make findings and determinations as required of the Department by applicable law; and to approve the award and amendment of all contracts let by the Department, the acquisition of real estate and the employment of all persons by special contract to render professional or consulting services, as may be required by law.

The Department itself is vested with all the authority, powers, rights, duties, liabilities, obligations and responsibilities now or hereafter granted by law to:

(1) *The Department of Public Sanitation and Board of Sanitary Commissioners.* This Department and governing board have been given the power generally to construct, maintain and operate sewers and sewage disposal plants; to collect garbage, refuse and ashes, and to prevent pollution. Ind. Ann. Stat. § 48-4201, *et seq.* (1963 Repl.).[3] Its potential jurisdiction involves the entire county, Ind. Ann. Stat. § 48-4205 (1968 Repl.) since, under the Act, new area may be incorporated as originally prescribed by law, with the additional requirement that such incorporation shall be approved by resolution of the City-County Council. Acts of 1969, ch. 173, § 902(a). Further, any special taxing district bonds of the sanitary district must be approved by resolution of the City-County Council, with the special tax required by law to be levied to pay principal and interest on such bonds to be levied each year by the City-County Council. Acts of 1969, ch. 173, § 503.

(2) *The County Drainage Board and the duties, powers and responsibilities of the County Surveyor insofar as they relate to drains, drainage and levees.* The county drainage board of a county having a first class city was, prior to the Act, comprised of the County Commissioners, as ex officio members, the county surveyor, and the city engineer of such first class city. Ind. Ann. Stat. § 27-2004 (1970 Repl.). The Board had authority generally to vacate, maintain, reconstruct or construct drains used to eliminate water from land with county-wide jurisdiction subject to several enumerated exemptions. Ind. Ann. Stat. § 27-2001 *et seq.*[4] (1970 Repl.). This authority is now vested in the Department of Public Works with its territorial limits extending to the entire county. Acts of 1969, ch. 173, § 902(b).

(3) *Department of Flood Control and Board of Flood Control Commissioners.* This Department and governing board have been given the power and authority generally to construct and maintain levees, dams, reservoirs, etc. in order to

---

3. Acts of 1917, ch. 157, Sec. 1, *et seq.;* IC 1971, 19-2-14-1 *et seq.*
4. Acts of 1965, ch. 305, Sec. 1, *et seq.;* IC 1971, 19-4-1-1 *et seq.*

prevent floods and conserve water resources. Ind. Ann. Stat. § 48-4727 (1970 Supp.)[5] The Department's territorial jurisdiction remains county-wide with an attendant special taxing district of the same boundaries. Ind. Ann. Stat. §§ 48-4729, 4735 (1963 Repl.).[6] The Act provides for the continuation of the special taxing district (Acts of 1969, ch. 173, § 903[c]), subject to the requirement that all bond issues be approved by resolution of the City-County Council, with the special tax required by law to be levied to pay principal and interest on such bonds to be levied each year by the City-County Council. Acts of 1969, ch. 173, § 503.

(4) *Board of Public Works of the First Class City* insofar as such laws relate: (a) to the acquisition, construction, maintenance, operation and improvement of public buildings or grounds owned or leased by the City; (b) to the operation of a municipal garage for maintenance and servicing of consolidated city vehicles; (c) to drains and drainage; and (d) to other public improvements, except where the authority and responsibility for such public improvements are granted to another department by the Act. Acts of 1969, ch. 173, § 902(d). As can be seen, this transfer of authority has little effect upon the citizens of the excluded cities and towns, as the exercise of its power is confined within the area of the consolidated city by the terms of the Act as that governmental unit is defined by Section 102(f).

(5) *A Board of Safety with respect to the City Market.* Acts of 1969, ch. 173, § 902(e). Again this transfer of authority will have little effect upon citizens of excluded cities and towns.

(6) *Any city of the first class or county to enforce the laws of the State of Indiana, the regulations of the State Board of Health, the State Air Pollution Control Board and other state agencies and all valid ordinances and rules of the consolidated city pertaining to air pollution.* Acts of 1969, ch. 173, § 902(f).

---

5. Acts of 1937, ch. 43, Sec. 1, as amended; IC 1971, 19-4-21-1.
6. Acts of 1937, ch. 43, Sec. 3, Sec. 9; IC 1971, 19-4-21-3, 9.

It is clear from this grant of authority to the Board of Public Works that it is to have county-wide jurisdiction in matters of air pollution, at least insofar as the enforcement of state laws and regulations is concerned.

From this cursory review of the powers and responsibilities delegated to the Department and Board of Public Works, it is clear that citizens of excluded cities and towns presently are and for additional reasons may be brought within its jurisdiction for certain matters. By virtue of their being subjected to this jurisdiction, it is equally clear that they have a right to a voice in the selection of the Mayor and City-County Councilmen, for it is those officers who appoint the Director of the Department and its governing Board. The same situation is found, to a greater or lesser extent, when considering the powers and responsibilities of the various other departments established by the Act.

On the other hand, it is apparent that many of the Act's provisions relate *only* to the territorial boundaries of the consolidated city and therefore affect only citizens of the consolidated city. This fact has already been demonstrated by our analysis of the powers and responsibilities of the Board of Public Works.

To restate the issue raised by both appellant and intervenor, we must decide whether the provision of the Act, allowing all citizens of the county to vote on the Mayor and members of the City-County Council, results in an unconstitutional dilution of the consolidated city citizen's vote where that citizen is subjected one hundred percent to the actions of those public officers and a citizen of an excluded city or town to a lesser extent.

First of all, we note that neither appellant nor intervenor attempts in any way to quantify the resulting "dilution" nor do they offer any means to this court whereby it might be measured or reasonably ascertained. Secondly, they fail to cite any case from any jurisdiction which has held that a dilution of this nature is an unconstitutional departure from the gen-

eral premise that each voting citizen within a geographical area has the right to cast a ballot of equal or approximately equal weight. Thirdly, they fail to point out *why* such alleged dilution should be held unconstitutional under Art. 1, § 23 other than to say that it does, in fact, grant certain privileges and immunities to some not granted to all.

This court has previously held that the provisions of Art. 1, § 23 and the protections extended by the Fourteenth Amendment to the United States Constitution concerning the abridging of privileges and immunities of citizens protect substantially identical rights. *Miles v. Department of Treasury* (1935), 209 Ind. 172, 199 N. E. 372; *Hammer* v. *State* (1909), 173 Ind. 199, 89 N. E. 850. We therefore feel constrained to look to the United States Supreme Court's interpretation of the Fourteenth Amendment as it relates to voting rights to assist us in determining whether the Act in question is violative of Art. 1, § 23.

The United States Constitutional requirements as they affect the voting rights of citizens voting for officers of local governmental units was discussed and summarized in the case of *Avery* v. *Midland County, Texas, supra*. The Court there concluded:

> "Our decision today is only that *the Constitution imposes one ground rule for the development of arrangements of local government:* a requirement that units with general governmental powers over an entire geographic area not be apportioned among single-member districts of substantially unequal population." (our emphasis) *Avery* v. *Midland County, Texas, supra*, 390 U. S. at 485-86, 20 L. Ed. 2d at 54.

Although that case is not directly on point with the question here under consideration, it is our opinion that it serves, by clear inference, as authority for the position we are about to take, namely that the Act does not grant certain privileges and immunities to a class of citizens not granted to all so as to render the Act violative of Art. 1, § 23.

In *Midland,* the Court was faced with the constitutionality of a scheme which provided for the election of a Commissioners Court from single-member districts of substantially *unequal population.* Under the Texas Constitution and statutes, the Commissioners Court is the governmental body for the county and each is comprised of four county commissioners and the county judge, who serves as the presiding officer. In Midland County, the commissioners had recently redefined the four territorial districts (Commissioner precincts) such that three had populations of less than one thousand (1000) persons and the fourth had approximately sixty-eight thousand (68,000) persons by virtue of an urban area located therein. The trial court had ordered redistricting so that each precinct would include substantially the same number of people.

The Texas Supreme Court reversed the trial court (*Avery* v. *Midland County* [1966], 406 S. W. 2d 422) taking the position that population was not the only relevant consideration to be applied:

> "We recognized . . . that the county commissioners court is not charged with the management and control of all of the county's business affairs; and that the various officials elected by all the voters of the county have spheres that are delegated to them by law and within which the commissioners court may not interfere or usurp. The voice of the rural areas will be lost for all practical purposes if the commissioners precincts of counties are apportioned solely on a population basis except, perhaps, in those few sparsely settled counties without a concentration of urban centers. Yet, important affairs of the county administered by the commissioners court—such as roads, bridges, taxable values of large land areas-disproportionately concern the rural areas. Theoretically, the commissioners court is the governing body of the county and the commissioners represent all the residents, both urban and rural, of the county. But developments during the years have greatly narrowed the scope of the functions of the commissioners court and limited its major responsibilities to the nonurban areas of the county. It has come to pass that the city government with its legislative, executive and judicial branches, is the major concern of the city dwellers and the administration of the affairs of the county is the major concern of

the rural dwellers." *Avery v. Midland County, supra,* 406 S. W. 2d at 428.

The United States Supreme Court, in reversing the Texas Supreme Court and holding that the commissioner precincts must be apportioned on the basis of population, said:

"The Texas Supreme Court concluded that the work actually done by the Commissioners court 'disproportionately concern[s] the rural areas' . . . Were the Commissioners Court a special-purpose unit of government assigned the performance of functions affecting definable groups of constituents more than other constituents, we would have to confront the question whether such a body may be apportioned in ways which give greater influence to the citizens most affected by the organization's functions. That question, however is not presented by this case, for while Midland County authorities may concentrate their attention on rural roads, *the relevant fact is that the powers of the Commissioners Court include the authority to make a substantial number of decisions that affect all citizens, whether they reside inside or outside the city limits of Midland."* (our emphasis) *Avery* v. *Midland County, Texas, supra,* 390 U. S. at 483-84, 20 L. Ed. 2d at 53.

Likewise here we are not asked to determine the constitutionality of giving *greater weight* to the vote of the consolidated city citizens who are affected to a larger extent by governmental action of the consolidated city. Rather, we are asked to determine the constitutionality of an Act which gives all citizens an *equal vote* in an election of Mayor and City-County Councilmen, a substantial number of whose decisions and actions affect all the citizens of the county. The principle of *Avery* is applicable here even though we have the converse situation, i.e. the citizens of the urban area are more greatly affected by the decisions of the governmental unit rather than the other way around as was true in *Avery.* We are unable to hold that a citizen of the consolidated city suffers an unconstitutional vote "dilution" when given a vote equal to that of a citizen of an excluded city or town, when the United States Supreme Court has, in effect, held that an

analogous "dilution" of a non-urban dweller's vote is permissible.

Appellant raises one last argument relevant to the excluded cities and towns concept incorporated in the Act which relates to the two percent debt limitation. More specifically appellant argues that the same property of the excluded cities or towns is included in the consolidated city for purposes of computing debt limitations and that since these municipal governments are designed for the same basic purpose, the Act constitutes an attempted evasion of the constitutional debt limitation found in Art. 13, § 1, of the Indiana Constitution.

Appellant, in this section of his argument, makes no reference to special taxing districts so we must assume that he is speaking only of the municipal corporations of the consolidated city and the individual excluded cities or towns. No section of the Act is cited, however, to support appellant's contention nor have we been able to discover any language there contained which might be construed in support of his assertion. To the contrary, the following sections of the Act are a clear rebuttal to the claim:

" 'Excluded City' shall mean any city other than a First Class City in the County and any town in the County having a population in excess of 5,000 inhabitants according to the last preceding United States decennial census." Acts of 1969, ch. 173, § 102 (d).

" 'Consolidated City' shall be a body corporate, created by this Act, and *including within its boundaries all of the Territory of a First Class City and of the County except for the territory located in Excluded Cities;* Provided, however, That certain departments and *special taxing districts* of the Consolidated City may have jurisdiction as provided in this Act in territory greater or less than such territorial boundaries . . ." (our emphasis) Acts of 1969, ch. 173, § 102 (f).

"Borrowing. *Power to borrow money which is a general indebtedness of the Consolidated City,* an indebtedness of a Special Taxing District for a public improvement in accordance with applicable law, or an indebtedness to be paid out

of revenues to be received by the Consolidated City, any Department, Special Taxing District or agency thereof; power to borrow money against current tax revenues; and power to borrow money in any other manner; all in accordance with laws applicable to cities of the first class and subject to the limitations of the Constitution of the State of Indiana." (our emphasis) Acts of 1969, ch. 173, § 205.

It is clear from the above that there is no statutory authority for including the assessed valuation of property located in excluded cities or towns with that in the consolidated city for purposes of ascertaining municipal debt limitations. The power to borrow is specifically restricted to the incurrence of debt by the consolidated city or a special taxing district. Given the territorial boundaries of the consolidated city as defined in Section 102(f), we fail to see any validity to appellant's contention.

The next argument advanced by appellant and also by intervenor again relates to the two percent debt limitation. It is here argued that the Act, in effect, abolishes the pre-existing taxing districts by transferring control over such districts to the consolidated city. The constitutional limitation, appellant and intervenor assert, is evaded by artifice and the bond limitations of several individual districts now exist within the governmental control of a single municipality, the consolidated city.

In order to answer this contention, it is first necessary to understand the legal nature of a taxing district and the rationale advanced by this court for the allowance of debt incurrence by governmental or taxing district units with coterminous boundaries. There have been many relatively recent cases which have discussed the constitutional propriety of the special taxing district device and the following cases have upheld the creation of flood control districts, *Book* v. *Board of Flood Control Commissioners* (1959), 239 Ind. 160, 156 N. E. 2d 87; redevelopment districts, *Alanel Corp.* v. *Indianapolis Redevelopment Commission* (1958), 239 Ind. 35, 154 N. E. 2d 515; conservancy districts, *Martin* v. *Ben*

*Davis Conservancy District, supra;* sanitary districts, *Department of Sanitation of The City of Hammond* v. *Solan* (1951), 229 Ind. 228, 97 N. E. 2d 495; and park districts, *Johnson* v. *Board of Park Commissioners of Fort Wayne* (1930), 202 Ind. 282, 174 N. E. 91.

From these cases, several principles may be synthesized respecting the creation of special taxing districts to pay for local improvements. In view of the many reported cases on the subject, we deem it unnecessary to here amplify on the legal precedents so established. Suffice it to say that the Legislature may create such special taxing districts for local public improvements and provide for the levy of special ad valorem taxes throughout the district based upon the benefit accruing to the property holders therein situated; the Legislature may determine the boundaries of such districts or delegate to an agency the power to so determine them, *conforming or not* to the political or governmental subdivision there located; the Legislature may designate the agency to perform the administrative functions necessary on behalf of the district; and obligations so incurred by such a district payable out of the special benefit ad valorem tax are not debts of a municipal corporation within the provisions of Art. 13, § 1, of the Indiana Constitution.

We now turn again to the assertion that the Act, in effect, destroys the existing taxing districts within the territorial boundaries of the consolidated city by placing them under the control of that municipal corporation thus created. Appellant and intervenor's objection to the plan appears to center on the fact that the agency designated by the Legislature to administer the taxing districts is, in all cases, a department of the consolidated city. However, it is not the agency designated to administer the functions of the taxing district that determines its validity. Rather, to be valid, a taxing district must have been created to provide for local improvements (not governmental or political in nature) of special benefit to the people and property within that district; further the

payment of any bonds issued to finance such improvements is to be accomplished from collections of a special district tax imposed on those individuals within the district receiving the benefit. Neither appellant nor intervenor allege any departure from these requirements but assert only that the mandates of Art. 13, § 1, are circumvented by the device and blatantly so where the city officials are granted authority over the districts. That the city officials may act as fiscal agents of the special taxing district was confirmed by the case of *Book* v. *Board of Flood Control Commissioners, supra.* We are not prepared to reverse a long line of judicial authority relative to special taxing districts in order to hold the schematic plan under consideration unconstitutional.

Appellant also asserts in this section of his argument that the Act creates a thoroughfare special taxing district and that the creation of such a district is another example of legislative attempts to evade the provisions of Art. 13, § 1. Section 1004 of the Act provides:

"Metropolitan Thoroughfare District Established. On the effective date of this Act, all of the territory included within the boundaries of the County shall become and constitute a Special Taxing District to be called the Metropolitan Thoroughfare District of ——— (wherein shall be inserted the name of the First Class City) for the purposes of programing, planning, designing, constructing, reconstructing, and operating thoroughfares within the boundaries of the County." Acts of 1969, ch. 173, § 1004.

Further it is provided at Section 1009:

"Special Benefit Tax. All property, real and personal, located within the Metropolitan Thoroughfare District shall be subject to a special tax for the purpose of providing funds to pay the total cost of such project, including all necessary incidental expenses of programming, planning and designing, which said special tax is hereby declared to be and constitutes the amount of benefits resulting to all of said property from such acquisition or work, and shall be levied as herein provided." Acts of 1969, ch. 173, § 1009.

That the Legislature may create special taxing districts to finance local public improvements has been recognized previously in this opinion and may no longer be doubted:

"If the purpose of the taxation is a local public improvement, as distinguished from a general political or governmental purpose, the legislature can . . . provide for the creating of a special taxing district to pay for such improvements." *Martin* v. *Ben Davis Conservancy District, supra,* 238 Ind. at 518, 153 N. E. 2d at 133.

As to precisely what constitutes a "local public improvement," there is no fixed rule:

"In a state growing rapidly in population and even more rapidly in scientific discovery, that which is considered an outstanding luxury in one decade frequently becomes an absolute necessity in the next. For this reason it is not possible for a court to announce a hard and fast rule defining a 'public local improvement' that will be binding upon the legislatures and courts in future years. On the contrary the definition must be left sufficiently flexible to take care of the necessities of the future." *Department of Public Sanitation of City of Hammond* v. *Solan, supra,* 229 Ind. at 240, 97 N. E. 2d at 501.

Although we do not consider the above language to be a legislative *carte blanche* for the creation of special taxing districts, we need not consider further the exact nature of a "local public improvement" for the construction and maintenance of roads and streets have long been considered to be such. As we said in *Rappaport* v. *Department of Public Health* (1949), 227 Ind. 508, 87 N. E. 2d 77:

"Roads and streets have through the years been thought of and considered as local improvements properly paid for by special assessments for the purpose." 227 Ind. at 522, 87 N. E. 2d at 82.

Nor can we, at this late date, fault the creation of the taxing district as an obvious attempt to evade the express provisions of Art. 13, § 1:

"The legislature has the power to create municipal corporations. It also has the power to create special taxing districts

(as distinguished from municipal corporations) for the purpose of local public improvements.

. . .

There is no constitutional provision limiting the number of municipal corporations or special taxing districts which the legislature, in its wisdom or its policy, may see fit to create. The constitutional provision limiting the debt of a municipal corporation fixed no such limitation." *Martin* v. *Ben Davis Conservancy District, supra,* 238 Ind. at 521, 153 N. E. 2d at 134.

We therefore hold the metropolitan thoroughfare taxing district to be a valid special taxing district of the consolidated city.

The caption to the next section of appellant's brief asserts that the "special service districts as separate bodies corporate result in dual office-holding, unequal protection and unequal taxation, and extend to some citizens privileges and immunities not available to others." Appellant fails, however, to follow these assertions with a legally cognizable argument and no questions are thereby presented. As to the dual officeholding aspect, appellant fails to cite any constitutional provision thought to be violated or any cases which might give some indication. No argument is made whatsoever respecting the assertion that the special service districts result in unequal taxation. In regard to the contention that the special service districts result in unequal protection and the extension of privileges and immunities to some not extended to all, appellant fails to cite any sections of the Act to verify or substantiate his bland assertion nor does he give any indication of authority relied upon. We have said on occasions too numerous to require citation of authority that points raised by an appellant not "argued" in the argument section of his brief are deemed waived. By "argument" we mean a clear presentation of appellant's contentions with respect to the issues presented, the reasons in support of the contentions with any applicable citation to authorities, statutes, and parts of the record relied upon, and a clear

showing of how the issues and contentions relate to the particular facts of the case under review. See Rule A.P. 8.3. This appellant has failed to do.

It is next urged by appellant that the Act gives the consolidated city unlimited authority to regulate, license and tax in excess of that given to other municipal corporations. Appellant refers only to Section 203 which provides simply:

"Licenses. Power to levy and collect taxes on taxable privileges and license and regulate such privileges." Acts of 1969, ch. 173, § 203.

We are not asked to construe the Act for purposes of determining the specific extent of the power delegated to the consolidated city under this section but only to determine whether the grant constitutes special legislation. It is appropriate here to refer back to that portion of this opinion dealing with the requirements implicit in Art. 4, §§ 22 and 23, and to remind appellant that the Act, by its terms, applies to any county containing one first class city. As we have noted previously, the classification pertaining to "consolidated cities" is constitutionally valid and appellant presents nothing under this section of his argument which would in any way impinge upon that holding.

Appellant also argues that the Act establishes a new form of government for a part of the state without a referendum vote of the people to be governed. Art. 1, § 1, of the Indiana Constitution provides that all power is inherent in the people and that all governments are and of right ought to be founded upon their authority. This constitutional provision is relied upon for the proposition that the right to alter or reform their government is reserved to the people.

No authority is cited to substantiate appellant's assertion that a referendum is required under Art. 1, § 1, before the Legislature can effect a change in the form of local governmental units. To the contrary, we stated in *Woerner* v. *City of Indianapolis* (1961), 242 Ind. 253, 177 N. E. 2d 34:

"Subordinate divisions of the government" are but parts of the statement as a whole. The state, by its legislature, may abolish, consolidate, combine, eliminate, or create new governmental corporations, or authorize such alterations to govern those who live in a given area. There is no constitutional guarantee for the continued existence of a governmental subdivision of the state. They are all creatures of the legislature." 242 Ind. at 266-67, 177 N. E. 2d at 40.

See also *Board of County Commissioners* v. *Sims* (1969), 252 Ind. 531, 251 N. E. 2d 9. A requirement that any such proposed legislative change must be submitted to the people for referendum has neither been recognized nor can it be implied from the language of Art. 1, § 1.

Appellant's twelfth assertion is that the Act gives the consolidated city absolute power to determine all matters regarding employment, discharge, promotion, and compensation of employees, but fails to recognize any right of tenure had by an employee of the pre-existing city, county, taxing district or independent board or agency except for policemen and firemen. Appellant thus concludes that the failure of the Act to recognize existing contracts of employment denies these employees equal protection of the law.

We need not decide whether appellant's argument is of constitutional proportions, for it is apparent that the Act *does* provide for the transference of employee, as well as other, contractual rights:

"At the time the power and duties to perform any function is transferred from any agency, board or commission of the First Class City, the County or any body corporate to the Consolidated City, or any Department, Special Taxing District or Special Service District thereof, the property, *records, personnel, contracts and all other rights and liabilities thereof* related to such function, including all rights and obligations arising under any pension or retirement fund, shall be similarly transferred . . ." (our emphasis) Acts of 1969, ch. 173, § 314.

Appellant also points to the fact that the Act *mandates* the purchase of insurance to protect policemen from liability for

acts done in the course of their employment but only *permits* the extension of similar protection to other employees. See Acts of 1969, ch. 173, §§ 229, 1230. There is no showing as to what way these provisions deny equal protection of the law and we fail to see the constitutional issue. It might well be said that the provision relating to insurance for the police force is a matter of compensation only, they being in a position of high liability risk.

A final argument advanced by appellant under this section of his brief is that the Act specifically provides that existing policemen and firemen are to be made employees of the new consolidated city without loss of rank, while employees of other departments of the pre-existing governmental units are not likewise provided for. Again, we see no constitutional issue nor does appellant, by argument, make one out. We are unable to discover any provision in our constitution *requiring* the guarantee of tenure or rank to employees of a municipal governmental unit.

It is next asserted that the provisions for the election of consolidated city officials are so vague and uncertain as to be void. This assertion, however, fails completely to be borne out by the express provisions of the Act. The Act provides that the Mayor shall be elected every four years.

> ". . . *in accordance with the general election laws relating to the election of city officials,* the first election to be held at the time of the primary and general election where city officials are elected under applicable law next following the creation of the Consolidated City, the term to commence on January 1 following each such general election." (our emphasis) Acts of 1969, ch. 173, § 301.

A similar provision provides for the election of members of the City-County Council. Acts of 1969, ch. 173, § 306. In referring to the "general election laws relating to the election of city officials", it is clear that the Legislature intended the time of such elections to be governed by Ind. Ann. Stat. § 29-

4312 (1969 Repl.).[7] The intent of the Legislature is crystal clear in this regard and no further comment need be made.

The caption to appellant's next contention asserts that the Act provides for arrest without process and for detention for investigation in denial of due process. The argument that follows, however, deals only with the disciplinary procedures provided by the Act relative to the police force and appears to have no relevance to the assertion made in the caption. We will therefore deal only with the points raised in the body of the argument.

It is there argued that the disciplinary procedures established for the police force deny a police officer his rights under the Fourteenth Amendment to the United States Constitution. Turning to the provisions of the Act, we note that Section 1227 provides a comprehensive procedure to be followed where a member of the consolidated city police force is to be subjected to disciplinary measures. In summary, the Section provides that the Police Chief may reprimand or suspend from active service for up to ten days without pay any officer of the force for cause upon written notification of the charge delivered to the officer by his immediate superior. This action may be taken by the Police Chief personally or by a Chief's Board consisting of four captains in the department. The decision to reprimand or suspend for up to ten days by the Chief or Chief's Board is not subject to review.

Where a police officer is subject to discharge, demotion or reduction in rank, or suspension from regular duty without pay for more than ten days, the Police Chief must appoint a Chief's Board to hear the charges. If a majority of the Chief's Board concur with the proposed disciplinary action to be taken, charges are then filed with the Merit Board. A copy of the written charges must be delivered to the officer being charged personally or by certified mail. The officer involved

7. Acts of 1945, ch. 229, Sec. 1; IC 1971, 3-2-7-1.

then has the right to appear before the Merit Board, represented, if he wishes, by counsel at a hearing set by the Board upon due notification. The Merit Board's decision, arrived at by majority vote, must be reduced to writing and is subject to review by the Director of the Department of Public Safety if demanded in writing by the disciplined officer.

If an appeal is taken to the Director, a de novo hearing is conducted with written notice thereof to the officer upon the issues raised by the charges. Again, the officer may be represented by counsel. The Director, as well as the Chief's Board and the Merit Board, have subpoena power enforecable by the circuit or superior court. Finally, provision is made for the right to appeal, by an aggrieved member of the force, to the circuit or superior court of the county.

We have taken the pains to outline the disciplinary procedures provided for by the Act to demonstrate the safeguards afforded a member of the consolidated police force subject to such discipline. It is readily apparent that these procedures far exceed those *thought to be required* by text writers in the area:

> "In the absence of legal limitations, policemen and firemen are removable at pleasure, without cause or hearing. However, the removal and suspension of policemen and firemen are ordinarily prescribed and regulated in more or less detail by the controlling local laws and rules authorized to be promulgated and in force thereunder." 4 McQuillin, Municipal Corporations § 12.230b. (1968).

We are unaware of any constitutional provision guaranteeing the right to be a police officer or to be a police officer free from disciplinary action. It is our considered opinion that the disciplinary procedures provided for by the Act respecting the discipline of members of the consolidated police force are eminently reasonable and beyond constitutional attack.

In appellant's final section of his brief, he contends that the Act provides for the establishment of a consolidated city police force educational loan fund and that such a fund con-

stitutes an illegal gift of public funds. We disagree. It is clear that the power to spend public monies for a particular purpose must be premised upon the power to tax for that same purpose. It is equally clear that taxes may be levied for *public* purposes only:

"It is implied in all definitions of taxation that taxes can be levied for public purposes only. This doctrine, now so firmly established in our system of constitutional law, is of comparatively recent origin and finds its justification in the due process clause of the Fourteenth Amendment to the Federal Constitution adopted in 1868. It was nine years later, however, before the United States Supreme Court applied the principle as a matter of substantive law. *Davidson* v. *Board of Admrs. of New Orleans* (1878), 96 U. S. 97." *State ex. rel. Jackson, Attorney General* v. *Middleton* (1938), 215 Ind. 219, 230, 19 N. E. 2d 470, 475.

As to what constitutes a public purpose, this court went on to say in *Middleton:*

"The exact line of cleavage between what is, and what is not, a public use, is somewhat difficult to mark. Some purposes readily align themselves on one side of the line as being clearly public in their nature, while others as readily fall on the other side as being obviously private, and there is a debatable ground between the two. The courts have never attempted to lay down with minute detail an inexorable rule distinguishing public from private purposes, because it would be impossible to do so. Such a determination is primarily one for the legislative branch of the government and it can not be held to any narrow or technical rule of action. *Courts will not intervene unless there is a plain departure from every public purpose which could reasonably be conceived.*" (our emphasis) 215 Ind. at 230-31, 19 N. E. 2d at 475.

See also *Ennis* v. *State Highway Commission of Indiana* (1952), 231 Ind. 311, 108 N. E. 2d 687.

We hold that the expenditure of public monies for the purpose of establishing or administering an educational loan fund for the benefit of the consolidated city police force *is* for a "public" purpose. We note that to be eligible, an applicant must be a high school graduate, between the

ages of eighteen and twenty, who agrees to apply, upon completion of his studies, for appointment to the consolidated city police force. It is therefore apparent that the Legislature may reasonably have conceived the purpose of the fund to be, among others: (1) a direct incentive for qualified young people to choose careers in the area of law enforcement; (2) a monetary incentive for such individuals to pursue formal educational courses in the area of law enforcement and police administration; and (3) a means by which law enforcement and police administration might be upgraded in the consolidated city.

This concludes our discussion of those points raised by appellant. We now turn to the additional issues raised by intervenor not previously covered. The first point to thus be considered is intervenor's assertion that the Act, in regulating commerce and industry, denies the persons regulated due process of law. Intervenor points to the fact that no procedure is provided by the Act for an administrative hearing before the authority of the consolidated city or its special taxing districts is exercised. The argument, however, is not persuasive. Without specifically enumerating those grants of power and authority challenged, or the remedies available to individuals subjected to what might be assumed to be an unlawful exercise of them, we note simply our previous holdings to the effect that a litigant is entitled to judicial review of administrative action taken by a board, commission or *governmental corporation,* notwithstanding the failure of the Legislature to provide for a statutory remedy. *Mann* v. *City of Terre Haute* (1960), 240 Ind. 245, 163 N. E. 2d 577; *State ex. rel. City of Marion* v. *Grant Circuit Court* (1959), 239 Ind. 315, 157 N. E. 2d 188. See generally, *Warren* v. *Indiana Telephone Co.* (1940), 217 Ind. 93, 26 N. E. 2d 399. There is ample precedent in this state holding that judicial review cannot be denied and that the Legislature's failure to specifically so provide is not fatal to the legislation in ques-

tion. Intervenor's argument ignores this well established rule and thus furnishes no basis upon which to invalidate the Act. It might be noted incidentally that the grants of power and authority here complained of are exactly of the same nature as those granted to all cities under Ind. Ann. Stat. § 48-1407 (1963 Repl.),[8] originally enacted in 1905.

Intervenor also argues that the Act impairs the obligation of contracts, by combining special taxing districts, in violation of Art. 1, § 24, of the Indiana Constitution. The essence of the argument here advanced, as we understand it, is that by combining the various taxing districts under departments of the consolidated city such that the same departmental agency will, in some cases, be administering more than one taxing district, there is a possibility that facilities constructed under prior bond issuances may not be properly maintained. Stated another way, where one department has the responsibility of maintaining facilities constructed by bonds issued under two or more "old" taxing districts, there may be inconsistent competing interests which will result in substandard maintenance of facilities thus constructed. This, intervenor alleges, adds additional terms and risks not contemplated by the purchasers of those bonds.

Intervenor cites the case of *City of Indianapolis* v. *Robinson* (1917), 186 Ind. 660, 117 N. E. 861 for a standard by which it may be determined whether a contract is unconstitutionally impaired:

> "A fair statement of the rule applicable to this class of cases, as established by the authorities, is that any change of the law embodied in the contract, as here, which will *substantially* postpone, obstruct or retard its enforcement, or lessen its value, whether the change relates to its validity, construction, duration or discharge, impairs its obligation. And it is immaterial whether it is done by acting on the remedy, or directly on the contract itself. In either case such legislation is inhibited by § 10, Art. 1 of the Constitution of the United States, and § 24, Art. 1 of the Constitution of this State." 186 Ind. at 663-64, 117 N. E. at 862.

8. Acts of 1905, ch. 129, Sec. 53; IC 1971, 18-1-4-1.

We are appreciative of the above quoted language, but we are unable to concede to intervenor's argument for two very basic reasons. First of all, intervenor premises the argument on a patently unsupportable assumption, to wit: that the combining of the taxing districts will inevitably lead to inconsistent competing interests within a department respecting the maintenance of facilities already constructed, which in turn will lead to improper maintenance, which in turn will affect the value and/or payment of the bonds issued to finance the facility. This court will not indulge in such rank speculation.

Secondly, even were we to concede that the *possibility* of such improper maintenance *might* affect the value and/or payment of such bonds we are unable to say that the effect would be *substantial. City of Indianapolis* v. *Robinson, supra.* See also *Ahlborn* v. *City of Hammond* (1953), 232 Ind. 12, 111 N. E. 2d 70; *Storen, State Treasurer* v. *Sexton, Marion County Treasurer* (1935), 209 Ind. 589, 200 N. E. 251. It cannot be said with any degree of certainty that improper maintenance of facilities, the construction of which was financed by taxing district bonds, would affect *at all* the repayment of the bonds or their value. This being so, we obviously are not prepared to hold that the effect of transferring administrative authority over taxing districts and their obligations under the terms of the Act, effects a *substantial* impairment of the bond holder's contract rights.

The argument next advanced by intervenor relates to the authority given a member of the consolidated city police force to make an arrest. It is here argued that the Act gives the police force of the Police Special Service District within the consolidated city the authority to make an arrest "without process" in violation of Art. 1, § 11, of the Indiana Constitution. Section 1216 of the Act provides as follows:

"The members of such Force shall have general police powers and be conservators of the peace within the Police

Special Service District; shall arrest without process all persons who commit any crime or misdemeanor contrary to the statutes of this State or the ordinances of any city or town within the Police Special Service District, or the ordinances of the County; . . ." Acts of 1969, ch. 173, § 1216.

Notwithstanding what the above quoted language might denote to the casual reader, it is clear that any such grant of police authority must be read in *pari materia* with the various state and federal constitutional provisions designed to safeguard the rights of an accused. We are unable to find any legal precedent standing for the proposition that every legislative act authorizing police action must specifically enumerate the many and varied constitutional provisions which have been interpreted to affect the exercise of such authority.

Additionally, intervenor fails to cite a single example or case where this court has failed to recognize or apply protectives constitutionally provided merely because they were not specifically enunciated in the provisions of a particular act. Returning to the provisions of the Act, it is clear that the "apparent" limitation of constitutional safeguards is no limitation at all. This court is well aware of its obligations in respect to such constitutional guarantees and, will not be bound by what might conceivably be construed as a statutory infringement thereon.

It is also urged by intervenor that the grant of authority to the officers of the consolidated city is an unconstitutional delegation of legislative authority, contrary to Art. 4, § 1, of the Indiana Constitution which vests such authority in the General Assembly. The specific section of the Act complained of reads in pertinent part as follows:

". . . and the Consolidated City shall have all the powers which are not prohibited under the Constitution of the State of Indiana are not denied by this Act or denied by any act of the General Assembly to a Consolidated City and are necessary and desirable in the public interest, subject in addition to the limitations of Sections 234 and 238 of this Act." Acts of 1969, ch. 173, § 233.

Intervenor cites the cases of *Orbison* v. *Welsh, Governor of Indiana* (1962), 242 Ind. 385, 179 N. E. 2d 727 and *Blue* v. *Beach* (1900), 155 Ind. 121, 56 N. E. 89 as demonstrative of the applicable legal principles involved when passing upon the validity of a legislative delegation of authority. However, both cases cited involve the delegation of legislative authority to a specific board or commission and the administrative officers thereof (the Indiana Port Commission and the state boards of health respectively) and are not precisely on point. As noted by McQuillin at 2 McQuillin, Municipal Corporations, §§ 4.01 *et seq.* (1968), a distinction may be drawn between a delegation of authority to a municipal corporation generally and a legislative delegation to a specific board or commission. To avoid an unnecessary lengthening of this opinion, we will not elaborate on the nature or effect of the distinction drawn, but rather will concern ourselves only with the constitutional limitations pertaining to a legislative delegation of authority to a municipal corporation.

Once again we turn to McQuillin for a general statement of the law:

> "While the rule is fundamental that the power to make laws cannot be delegated, the creation of municipal corporations to exercise local self-government has never been deemed to violate this principal. *Such legislation is not regarded as a transfer of general legislative power, but rather as a grant of the authority to prescribe local regulations,* supported by immemorial practice, but subject, of course, to the interposition of the superior in cases of necessity. Conferring proper powers upon municipal corporations forms an exception to the rule which forbids the legislature to delegate any of its powers to subordinate divisions." (our emphasis) 2 McQuillin, Municipal Corporations § 4.09 (1968).

That this court has followed the rule may be shown by the case of *Sarlls, City Clerk* v. *State ex. rel. Trimble* (1929), 201 Ind. 88, 166 N. E. 270:

> "The Legislature may delegate to municipal corporations and their officers *all powers incidental to municipal govern-*

*ment*, whether legislative or otherwise, without violating the rule against a delegation by the Legislature of its law-making power." (our emphasis) 201 Ind. at 108, 166 N. E. at 278.

See also *Town of Walkerton* v. *New York, Chicago & St. Louis R.R. Co.* (1939), 215 Ind. 206, 18 N. E. 2d 799; *Zoercher* v. *Agler* (1930), 202 Ind. 214, 172 N. E. 186.

Clearly, the legislative delegation of authority here questioned relates only to the consolidated city and grants only those powers which are *necessary or desirable in the public interest*. Should the consolidated city, at a later date, pass an ordinance without the scope of the grant, its propriety, in light of the powers delegated, is always subject to judicial review. See *City of Delphi* v. *Hamling* (1909), 172 Ind. 645, 89 N. E. 308; and *City of Shelbyville* v. *Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.* (1896), 146 Ind. 66, 44 N. E. 929, and cases there cited.

The last contention of intervenor, which has not been previously dealt with, is that the Act violates the terms of Art. 6, § 2, of the Indiana Constitution by depriving the citizens of the county the opportunity to elect certain officers. Art. 6, § 2, provides that certain county officers shall be *elected* in each county. It is apparently intervenor's argument that most of the duties and responsibilities of these officers, the Auditor, Treasurer and Sheriff in particular, are transferred to the consolidated city and that as a result, these officers are no longer of any import. Consequently, he would argue, the people of the county are deprived of their right, in substance at least, to "elect" these county officers. In response, however, we would note simply that while the *office* itself is of constitutional stature, the respective *duties* of each officer are not. Intervenor cites no authority, nor have we been able to discover any, which would bind this court to the proposition that the duties of various county officers must remain static and beyond the reach of the Legislature. We are not about to so hold here.

Having thus concluded the somewhat lengthy and arduous task of dealing with the various contentions raised by both appellant and intervenor, we should like to comment briefly on the quality of briefs presented for our consideration in this case. Without doubt, it is the duty and responsibility of this court to deal with all arguments properly presented regardless of their number or difficulty; with this we do not disagree nor do we begrudge an appellant the opportunity of presenting any legitimate issues raised by the litigation under review. The responsibility, however, for seeing that the issues thus presented are correctly decided does rest ultimately but *not solely* with the court. An appellate attorney has an obligation, both to his client and this court to see that the issues raised are suitably argued. This obligation was not adequately met by the parties before us. Time and again weighty assertions involving the basic validity of the Act were made with only the most meager of arguments advanced to support them. Often there was no citation of authority nor even a reference to the sections of the Act thought to be objectionable. Certainly the obligation of an appellate attorney goes beyond the making of bare assertions, leaving the court to its own devices to ascertain the precise nature of the contentions made and the law, if any, applicable thereto. We have, throughout our consideration of this appeal, indulged in a great deal of patience which we neither consider required on our part nor guaranteed for the future. Our appellate rules, previously referred to in the text of this opinion, outline in general form the requirements for a legally cognizable argument. Adherence to this standard is not left open to the option of an appellate attorney.

For the numerous reasons above detailed, the judgment of the trial court is affirmed in all respects.

Judgment affirmed.

Arterburn, C.J., DeBruler, Givan and Prentice, JJ., concur.

NOTE.—Reported in 266 N. E. 2d 25.