## STOCKING *v.* THE STATE.

Section 9 of art. 7 of the constitution, does not prohibit the legislature from dividing existing judicial circuits, or making new circuits, whenever they choose to do so.

A statute creating a new circuit out of others then existing, is not liable to any constitutional objection as being local.

Where the constitutionality of a statute is merely doubtful, it is the duty of the Courts to sustain it.

The legislature can not, by a declaratory enactment, make a vacancy in an office created by the constitution.

An existing office, without an incumbent, is vacant, within the meaning of the constitution.

When a new circuit is created, it is competent for the governor to appoint a judge thereof, to hold his office until a judge shall be elected.

By the R. S. 1852, a conviction and sentence of a person for a crime does not render him incompetent as a witness.

The evidence of an accomplice should be carefully scrutinized by the Court and jury; yet the jury may convict upon such evidence, even though it be unsupported by any corroborating testimony.

The *corpus delicti*, in a prosecution for murder, may be proved by circumstantial evidence. It is not essential that the body of the deceased should be found.

On the trial of a prisoner for murder, the Court instructed the jury as follows: "The jury have the right to determine the law and the facts, but it is the duty of the Court to instruct the jury what the law is." *Held*, that the instruction was correct.

The Court also instructed the jury as follows: "To kill a man purposely and with premeditated malice, or to kill a man in the commission of or the attempt to commit a crime—such as a robbery or arson—is murder in the first degree. And it is no difference (in the attempt to commit arson) whether he is killed before the fire reaches him or he is burned to death." *Held*, that the instruction was proper.

Nov. Term,
**1855.**

STOCKING
*v.*
THE STATE.

Friday,
December 21.

APPEAL from the *Tippecanoe* Circuit Court.

STUART, J.—*David M. Stocking* was indicted for the murder of *John Rose*. The result of his trial was a verdict of murder in the first degree, and that he suffer death. Judgment of the Court accordingly. A motion for a new trial, interposed at the proper time, was overruled, exceptions taken, &c. The evidence is all made part of the record.

The indictment contains several counts, laying the mode of death in various ways. The substance of these counts it is unnecessary to state, as no question of variance arises in the record.

The history of the murder is briefly this. It appears that *Stocking* had meditated the robbery of *Rose* for some time, and had spoken of it to several persons with a view to a confederacy to accomplish it. The object was money, which it was supposed *Rose* had in his business at the warehouse. Accordingly, on the night of the 8th of *January*, 1855, *Stocking*, with two others, whose names were unknown, entered the warehouse of *Rose*, roused him from sleep on pretence of business, and as soon as he opened the bed-room door, inflicted upon him several wounds. To make sure work, they returned to inflict further violence on their prostrate victim, and then fired the warehouse as they retired. The body was seen during the

progress of the fire, but could not be reached; and it was consumed with the building.

The evidence shows a chain of circumstances leading inevitably to the one conclusion—the guilt of the prisoner.

Counsel for the prisoner assign several errors, which, so far as they can be regarded material, we will notice in their order.

The first point made is, that the Court trying the cause was not organized in conformity to the constitution.

In *February*, 1855, an act was passed, creating the twelfth judicial circuit. Acts 1855, p. 68. The new circuit, embracing the counties of *White, Jasper, Benton* and *Tippecanoe*, was carved out of three other circuits already organized.

It is insisted that this act is inconsistent with the provisions of section 9, of article 7, of the constitution, viz.:

"The state shall, from time to time, be divided into judicial circuits; and a judge for each circuit shall be elected by the voters thereof. He shall reside within the circuit, and shall hold his office for the term of six years, if he so long behave well."

The position taken is, that the subdivision of the state into circuits can be made only every six years; that no division can be made or new circuits created at any intermediate time. There is nothing in the section itself requiring such a construction. The words "from time to time" do not import any particular period. Certainly these words will admit, and the common sense of the case would seem to require, that the legislature might create new circuits from "time to time," as in their opinion the exigencies of business might require. Nor is it objectionable as a local law. It is not one of those enumerated in the constitution, on which local legislation is inhibited. Section 22, article 4. If objectionable at all, it must come under the general provision in the next section, that all laws should be general, whenever a general law could be made applicable. Section 23, article 4. This does not seem to us such a case; and even if we doubted, we should be bound to throw the benefit of the doubt in favor

of the constitutionality of the law. *Maize* v. *The State*, 4 Ind. R. 342.

It is objected that the judge who presided was not properly the judge of that circuit, because appointed by the governor instead of being elected by the people. The objection is not well taken. The act creating the circuit was declared in force from its passage, as a case of emergency. Laws of 1855, p. 69. This it was competent for the legislature to do. Section 28, article 4. We lay no stress on the declaration of the legislature that there was a vacancy in the office of circuit judge of the new circuit. If there was a vacancy, it existed independent of that declaration. If there was no vacancy, that body could not create one by a declaratory enactment. The vacancy flowed as a natural consequence of their doing what they had a right to do—to create a new circuit. There is no technical nor peculiar meaning to the word "vacant," as used in the constitution. It means empty, unoccupied; as applied to an office, without an incumbent. There is no basis for the distinction urged, that it applies only to offices vacated by death, resignation, or otherwise. An existing office, without an incumbent, is vacant, whether it be a new or an old one. A new house is as vacant as one tenanted for years, which was abandoned yesterday. We must take the words in their plain, usual sense. 2 R. S., p. 339.—*Id.* pp. 223, 341. The emergency which created the office, would imply that the vacancy in the office of judge in the new circuit should be filled immediately. The 18th section, article 5, provides that the governor shall, by appointment, fill a vacancy in the office of judge of any Court. We think this appointment well made under that section.

During the progress of the cause, several exceptions were taken to the ruling of the Court.

*Maloney*, who had served on the grand jury, was introduced to prove what *Stocking* had sworn to when the murder of *Fahrenbaugh* was under investigation. The purpose of this evidence was not to implicate *Stocking;* nor had it that tendency. It was to corroborate and sustain

the witnesses for the state. It went to show that there was an intimacy between the prisoner and the witnesses— giving strength to the probability that they would communicate their designs and deeds of crime to each other. For this purpose the evidence was properly admitted.

It is objected to the sufficiency of the evidence, that on material points there was only the testimony of *Longley*, an accomplice, whose character was infamous. It is very true that the, evidence of persons standing in such a relation to each other, should be carefully scrutinized by the Court and jury. Yet to exclude it altogether, would often exclude the only means of disclosing guilt. For this reason, the revised statutes abolished the distinction which the pronouncing of judgment formerly made in regard to a witness that was infamous. 2 R. S., p. 80, and s. 243, p.' 83. What before affected his competence, under that enactment, goes only to his credibility. In looking through the evidence, we find *Longley* corroborated by *Clark* and *Driskill*. But they too were infamous. It may well be doubted, however, whether *Longley* was an accomplice. Even if he were, and if he stood alone, unsupported by any corroborating testimony, the jury might convict on his evidence. *Johnson* v. *The State*, 2 Ind. R. 652; followed and approved in *Dawley* v. *The State*, 4 *id.* 128.

The jury passed upon the credibility of the witnesses, and their conclusions in that regard will not be reviewed.

The *corpus delicti* may, like any other part of the case, be proved by circumstantial evidence. Looking at the evidence in the record, we have no reason to doubt that the human body seen in the flames was the body of *John Rose*. The position of *Stocking*, watching it intently during the progress of the fire, is peculiarly significant.

There can not be a reasonable doubt of his guilt. Even if the evidence were not such as fully to satisfy us, had we tried the cause, we should be slow to disturb the verdict. 7 Blackf. 186.—4 Ind. 580.

It only remains to examine the instructions. Exception is taken to the second paragraph, which is in these words, viz.: " The jury have a right to determine the law and the

facts, but it is the duty of the Court to instruct the jury what the law is." This instruction is correct. It is far less objectionable than that which this Court has sustained. *Carter* v. *The State*, 2 Ind. R. 617. There the instruction was, that it was "the duty of the jury to believe the law as laid down by the Court;" and it was held to be correct.

The fifth instruction is in these words:

" To kill a man purposely, and with premeditated malice, or to kill a man in the commission or in the attempt to commit a crime—a robbery or an arson—is murder in the first degree. And it is no difference whether he is killed before the fire reaches him or is burned to death. It is not necessary to the conviction for murder that the body of the deceased should be found, but the jury must be satisfied that *Rose* was killed by some one of the means described in the indictment." This instruction, so far as it assumes to define the crime, accords with the statute. 2 R. S., s. 2, p. 388. The latter part states the law correctly. It implies that in the absence of the body being found, the evidence shall be of such a nature as, in some measure, to account for the body not being found; as in this case, the course of evidence showed that it was destroyed by fire and could not be identified. The eighth instruction, on the subject of reasonable doubts, and the tenth, on the right of the jury to determine the credibility of the witnesses, are in the usual language of the books. The eleventh impressively urges upon the jury the importance of their position, and the necessity of care and prudence in their deliberations.

Of this timely admonition to the jury, the defendant has no right to complain.

*Per Curiam.*—The judgment is affirmed with costs.

*E. A. Greenlee* and *E. H. Brackett*, for the appellant.

*R. C. Gregory* and *H. W. Chase*, for the state.