The INDIANA GAMING COMMISSION, Alan I. Klineman, Chairman, Ann Marie Bochnowski, Secretary, Gilmer Gene Hensley, David E. Ross, Jr., Robert W. Sundwick, Donald Raymond Vowels, Members, Appellants (Defendants Below),

v.

Charles MOSELEY, Adair Simmons, Herbert S. Lasser and Lionel Cohen, Appellees (Plaintiffs Below).

No. 64S00–9406–CV–560.

Supreme Court of Indiana.

Nov. 21, 1994.

Pamela Carter, Atty. Gen., Jon Laramore, Arend J. Abel, Deputy Attys. Gen., Indianapolis, for appellants.

John M. Rhame, III, Portage, William G. Conover, Valparaiso, Garrett V. Conover, Portage, for appellees.

Gilbert King, Jr., MacArthur Drake, Hamilton L. Carmouche, Gary, for appellant-intervenor City of Gary.

Arthur P. Kalleres, Thomas K. Downs, Michael J. Lewinski, Indianapolis, for amicus curiae Indiana Ass'n of Cities and Towns.

John R. Schaibley, III, David L. Johnson, Amy E. Kosnoff, Indianapolis, for amici curiae City of Hammond, East Chicago, Lawrenceburg, Rising Sun, Michigan City, Evansville and Gary.

Michael T. Schaefer, Indianapolis, for amici curiae City of Portage and Portage Chamber of Commerce.

Douglas R. Brown, Philip R. Thompson, William N. Ivers, Peter J. Rusthoven, Andrew J. Detherage, David E. Kirtley, Indianapolis, for amicus curiae Indiana Gaming Ass'n.

SHEPARD, Chief Justice.

Four Porter County residents sued the Indiana Gaming Commission to challenge the statute authorizing riverboat gambling in Indiana. The Porter Superior Court held that the statute violated the Indiana Constitution and enjoined the Commission from issuing licenses. The Commission initiated this direct appeal. We conclude the statute is constitutional and reverse the judgment of the trial court.

### I. Facts and Case History

The Indiana Constitution of 1851 contained a prohibition against lotteries that served to retard various forms of gambling in the state. *See, e.g., State v. Nixon* (1979), 270 Ind. 192, 384 N.E.2d 152 (pari-mutuel wagering on horse races held unconstitutional). In the 1980s, the General Assembly proposed a constitutional amendment deleting this prohibition, and the voters approved the amendment during the 1988 general election. The legislature proceeded at its very next session to authorize horse race gambling, Ind.Code Ann. art. 4-31 (West Supp.1989), and a state lottery, Ind.Code Ann. art. 4-30 (West Supp. 1989). The lottery has long been up and running, and, as of a few weeks ago, so are the horses.

In 1993, a special session of the General Assembly added riverboat casinos to the list of permissible gambling enterprises. Ind. Code Ann. art. 4–33 (West Supp.1994). The statute creates the Indiana Gaming Commission, which is authorized to issue up to eleven riverboat casino licenses: five on Lake Michigan, five on the Ohio River, and one on Patoka Lake. Ind.Code Ann. § 4–33–6–1. The statute permits the Commission to license riverboats in these areas only if (1) the local legislative body approves of the practice through an ordinance and (2) the voters of the area vote for gambling in a referendum. Ind.Code Ann. §§ 4–33–6–18 to –20.

The act further provides these referenda shall be county-wide in the counties contiguous to the Ohio River, in the counties contiguous to Patoka Lake, and in any counties contiguous to Lake Michigan with less than 400,000 people. Ind.Code Ann. § 4–33–6–19. In any county next to Lake Michigan with more than 400,000 people the statute requires referenda in cities of less than 100,000, voting to be by city. Ind.Code Ann. § 4–33–6–20. A referendum is thus not required in cities over 100,000 in counties over 400,000. Simply put, all referenda are to be held on a county-wide basis except in Lake County. In Lake County, the voting is by city, except that Gary is not required to conduct a referendum.[1]

The present litigation arose following referenda in the three counties on Lake Michigan. In Lake County, the voters in East Chicago and Hammond voted for gambling. LaPorte County's voters did likewise. Porter County, however, voted 20,790 to 15,186 against gambling; voters in Portage voted for gambling but were outnumbered by opponents in other parts of the county.[2]

Appellees Lasser and Cohen are landowners in Porter County who hoped to use their land for riverboat gambling operations. They joined with two Portage businessmen, appellees Moseley and Simmons, in suing the Commission in the Porter Superior Court.

These plaintiffs contended that the statute's referenda provisions violated the Indiana Constitution by contravening Article I, section 23 on privileges and immunities and Article IV, sections 22 and 23 on special legislation. The trial court initially held for the Commission, upholding the constitutionality of the statute against all claims. When it ruled on appellees' motion to correct errors, however, the court held instead that the statute violated Article IV, section 23, and it enjoined the Commission from acting further to process licenses. The court did not alter its previous holding that the statute conformed to Article I, section 23.

The Commission sought an expedited appeal, which this Court granted. It appeals the trial court's determination that the statute violates Article IV, section 23. Appellees cross-appeal pursuant to Ind.Trial Rule 59(G), contending the trial court erred in holding that the statute conformed to Article I, section 23. Both parties and numerous amici curiae have provided excellent briefs, for which we express our thanks.

■ This Court analyzes questions arising under the Indiana Constitution by examining the language of the text in the context of the history surrounding its drafting and ratification, the purpose and structure of our constitution, and case law interpreting the specific provisions. *State Election Bd. v. Bayh* (1988), Ind., 521 N.E.2d 1313. We begin with appellants' claim that the trial court erred when it held the riverboat gambling act unconstitutional under Article IV and then consider the Article I claim.

### II. The Claim Under Article IV, Sections 22 and 23

The various parties, including appellees and amicus, either implicitly acknowledge or explicitly assert that the statutes at issue do not involve any of the seventeen categories enumerated in section 22. Accordingly, we focus on section 23.

---

**1.** Pursuant to a 1989 act of the legislature, Gary earlier voted in favor of permitting casinos in their city. *See* An Act to amend the Indiana Code concerning elections, Pub.L. No. 9, § 6, 1989 Ind.Acts 420, 422.

**2.** Various counties along the Ohio River also held referenda, with some counties voting for gambling and others against it. There has not yet been a referendum concerning Patoka Lake.

*A. Constitutional Origins.* Fiscal woes attendant to the Wabash–Erie Canal played a central role in the decision to call the Constitutional Convention of 1850, but there were a variety of catalysts for drafting a new state constitution. In his annual message to the General Assembly in January 1848, Governor James Whitcomb outlined the problems requiring attention and made it clear that one of those was the spectacle of a legislature awash in proposals for special and local laws:

> Occasion has been repeatedly taken in my former messages, to allude to the great amount of our local or special legislation, the danger of injustice by its means to individual interests, its expense to the treasury, and the large portion of time it necessarily occupies to the detriment of that mature and thorough consideration which is due to subjects of a general character.

*House Journal,* 32d sess. 131 (1848). Whitcomb later even went so far as to say that "[i]f calling a convention to amend the constitution were productive of no other result than furnishing an effectual remedy for th[is] growing evil [of special and local legislation], it would be abundantly justified." *House Journal,* 33d sess. 24 (1849).

3. *See, e.g.,* An Act authorizing the Vermillion Circuit Court to hear the application of Susan Coleman for a divorce and change of name, ch. LXXIV, 1849–50 Local Laws of Ind. 105 (1850); An [A]ct to authorize Margaret Hurd to file a bill for a divorce in Martin Circuit Court, and to regulate the proceedings thereon, ch. XC, 1849–50 Local Laws of Ind. 129 (1850); An Act for the relief of Hannah S. Martin, ch. CL, 1849–50 Local Laws of Ind. 194 (1850).

4. *See, e.g.,* An Act to prevent the unnecessary obstruction of Otter Creek, in the county of Vigo, ch. LII, 1849–50 Local Laws of Ind. 83 (1850); An [A]ct to vacate certain blocks, streets, and alleys in Michigan City, LaPorte county, Indiana, ch. CCXXV, 1849–50 Local Laws of Ind. 344 (1850); An Act declaring a certain stream therein named a public highway, in the county of Shelby, ch. CCXLIII, 1849–50 Local Laws of Ind. 375 (1850); An Act providing for the opening of streets and alleys in the City of Indianapolis, ch. CCXLIV, 1849–50 Local Laws of Ind. 376 (1850).

5. Governor Whitcomb described the growth of this practice in his December 1848 message:

Under the Indiana Constitution of 1816, the legislature regularly adopted statutes on everything from individual divorces[3] to particular streams, roads, streets, and alleys.[4] The practice grew worse throughout the 1840s.[5] By the time of the 1849 and 1850 sessions, over 90% of the laws passed by the legislature were special legislation of this sort. Frank E. Horack & Matthew E. Welsh, *Special Legislation: Another Twilight Zone,* 12 Ind.L.J. 109, 115–16 (1936); *see also* Horack & Welsh, 12 Ind.L.J. 183, 192–93 (1937). Debate on the floor of the ensuing convention emphasized the concern over the effects of this flood of local legislation.[6] The resulting provisions in the legislative article are the subject of this litigation. They provide:

Article IV, section 22.

The General Assembly shall not pass local or special laws: Providing for the punishment of crimes and misdemeanors; Regulating the practice in courts of justice; Providing for changing the venue in civil and criminal cases; Granting divorces; Changing the names of persons; Providing for laying out, opening, and working on, highways, and for the election or appointment of supervisors; Vacating roads, town plats, streets, alleys, and public squares; Summoning and empaneling grand and

> The number of pages of general laws passed at those sessions respectively, commencing with that of 1843–44 are consecutively, 122, 92, 135, 164, and 125, while the pages of a local or private character are, 180, 301, 365, 431 and 636, respectively.
>
> Thus while the amount of our general legislation has for the last five years remained nearly stationary, that of local and private character has, within the same period, advanced more than three hundred and fifty per cent.

*House Journal,* 33d sess. 23 (1849).

6. The delegate from Tippecanoe County, Mr. John Pettit, demanded that the convention engraft the protections now provided by sections 22 and 23 into the Constitution, arguing that "[local legislation] is the whole error—the whole incongruity—the whole oppression of our law, and almost the whole necessity of calling this Convention, was to do away with this local legislation.... All that is most necessary is to have uniformity in our laws." 2 *Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana, 1850,* at 1771 [hereinafter *Debates*].

petit juries, and providing for their compensation; Regulating county and township business; Regulating the election of county and township officers and their compensation; Providing for the assessment and collection of taxes for State, county, township, or road purposes; Providing for the support of common schools, or the preservation of school funds; Relating to fees or salaries, except that the laws may be so made as to grade the compensation of officers in proportion to the population and the necessary services required; Relating to interest on money; Providing for opening and conducting elections of State, county, or township officers, and designating the places of voting; Providing for the sale of real estate belonging to minors or other persons laboring under legal disabilities, by executors, administrators, guardians, or trustees.

Article IV, section 23.

In all the cases enumerated in the preceding section, and in all other cases where a general law can be made applicable, all laws shall be general, and of uniform operation throughout the State.

The drafters thus expressed a preference for general laws, but they also recognized that special laws were sometimes necessary. Acknowledging this preference, however, provides little guidance for distinguishing between special and general legislation. Courts and legislators have struggled since 1851 to articulate a consistent basis for determining when a law is special, and when its subject could be addressed through a general law.

*B. Case Law.* We have always begun by presuming the constitutionality of statutes challenged under sections 22 and 23. As we observed in *Stocking v. State* (1855), 7 Ind. 326, "even if we doubted [whether a law passed section 23 scrutiny], we should be bound to throw the benefit of the doubt in favor of the constitutionality of the law." *Id.* at 328–29. *Stocking* and subsequent cases suggest a high degree of deference to the legislature on section 23 questions. For most of the ensuing century and a half, however, this Court has regarded challenges to a law's specific or local character as justiciable questions. Our first such declaration was in *Thomas v. Board of Commissioners* (1854), 5 Ind. 4, where we said: "Whether the legislature have, in the case at bar, acted within the scope of their authority, is ... a proper subject of judicial inquiry." *Id.* at 7.

Our justiciability rule did take a substantial detour beginning with *Gentile v. State* (1868), 29 Ind. 409, where the Court said there was no role for judicial review and characterized the section 23 inquiry as "peculiarly address[ed] ... to the legislative judgment." *Id.* at 414. This approach, however, fell under periodic criticism [7] and eventually came to be ignored,[8] and then ridiculed.[9] Finally, in 1933, we overruled *Gentile* outright:

> [I]f the Legislature may arbitrarily decide that a general law cannot be made applicable, and its decision is final and cannot be questioned, it is not restrained or restricted in any sense, and the constitutional provision is, if not a nullity, at least a mere admonition.

> .  .  .  .  .

> ... It is inevitable that there should be differences of opinion as to the constitutionality of enacted legislation, but it was intended by the framers of the Constitution that the decision of this court should

---

7. *See, e.g., State ex rel. City of Terre Haute v. Kolsem* (1891), 130 Ind. 434, 445, 29 N.E. 595, 598 (McBride, J., dissenting); *State ex rel. Pitman v. Tucker* (1874), 46 Ind. 355, 362 (Buskirk, J., dissenting).

8. *See, e.g., Rosencranz v. City of Evansville* (1924), 194 Ind. 499, 143 N.E. 593 ("[T]he question whether a law general in form is general or special is a judicial one."); *State v. Wiggam* (1918), 187 Ind. 159, 118 N.E. 684.

9. *Fountain Park Co. v. Hensler* (1927), 199 Ind. 95, 107, 155 N.E. 465, 469:
   [T]he dicta of [*Gentile* and its progeny] cannot change the rule of law that the power to construe the Constitution is a judicial power. The present legislative tendency toward special and local legislation under the guise and verbiage of general laws should be checked, by the Legislature itself, or, by the courts, if it fails to do so; otherwise the body of the law will soon revert to the chaotic condition which existed under the old Constitution of 1816....

determine the law and the limits of legislative power, and not the decision of the Legislature.

*Heckler v. Conter* (1933), 206 Ind. 376, 379, 381, 187 N.E. 878, 879. Lest there be any doubt, *Thomas* and *Heckler* represent our view today.

C. *Is This Act Special Legislation?* We turn, then, to the threshold question of whether the subject of the riverboat gambling act is amenable to a general law of uniform operation throughout the state. If the answer is no, our inquiry ends and the act is constitutional under section 23. *Cash v. Clark County* (1855), 7 Ind. 227, 229 ("The subject matter of the law being entirely local, we do not see how a local law applicable to it can infringe any constitutional provision."). If the subject matter does permit general application, however, we must examine whether the law, even if general in form, is special as applied.

It is apparent that the legislature's decision to permit casino gambling only on riverboats has the effect of rendering most Indiana counties unable to participate.[10] Like the decisions to authorize a lottery and to permit horse race gambling, however, this decision appears to be a valid selection among forms of gambling and not a subterfuge for evading section 23. Hoosiers hardly invented the notion of putting casinos on boats. Across our border to the west, Illinois licenses floating casinos on its rivers, a move prompted in part in response to Iowa's launching of riverboat gambling along the Mississippi.

The Constitution provides no clear guidance to help us identify those cases in which a local law should be allowed. One of the unintended results of *Thomas* was a tendency for the legislature to bend over backwards to structure every law in general terms, which forced this Court to attempt to gauge the extent to which the categories are natural to the subject matter and truly open. *See, e.g., Dortch v. Lugar* (1971), 255 Ind. 545, 552–53, 266 N.E.2d 25, 31 (an act is general if it "treats all persons alike under

the same or similar conditions and circumstances, and the classification is reasonable and naturally inherent in the subject matter").

■ Here the legislature decided to permit a particular form of gambling. It identified the universe of Indiana counties suitable to host riverboat gambling. Limiting the locations of riverboats to the specified counties naturally flows from fact that not every county is home to a suitable body of water. It is inherent in the riverboat decision to permit riverboats. We conclude that riverboat gambling is not subject to a uniform law of general applicability.

■ To their credit, counsel for appellees recognize this, and argue beyond it that all counties selected must still be treated alike. We conclude that the distinctions drawn between Lake County and the others fit this purpose of this local law. In Lake County, the whole of the waterfront is covered by substantial cities, whose residents have the greatest interest in how the shore is used. In all the other counties, however, the shore contains both incorporated and unincorporated territory. It thus seems sensible to stage a vote of all persons in the county.

### III. The Claim Under Article I, Section 23

The appellees contend the trial court wrongly held the instant statute constitutional under Article I, section 23. We proceed now to that claim.

A. *History.* As we noted above, the state's financial woes played a central part in the decision to write a new constitution. In the wake of the Panic of 1837, the people of Indiana were determined to limit the legislature's involvement in private commercial efforts. They had seen their state bank struggle and eventually suspend services. They had watched their grand internal improvement system sap the state treasury and bankrupt the state. Blame for these ills largely fell on the legislature, and the people

10. We take judicial notice of the fact that waterways or other bodies of water sufficient to accommodate the size of riverboat contemplated by

the statute are not found in most counties in our state.

were determined to limit the power of that body. *See generally* 1 John D. Barnhart & Donald F. Carmony, *Indiana From Frontier to Industrial Commonwealth* ch. 19 (1954); 2 *id.* at ch. 5; James H. Madison, *The Indiana Way* chs. v, vii (1986). Article I, section 23 was the result of this desire to put the state's finances right.

The author of the provision, delegate Daniel Read of Monroe County, championed the forces opposing government involvement in private commerce and argued vehemently against state monopolies.[11] Before introducing the Equal Privileges or Immunities Clause, Read asserted:

> Money making is not the business of the State.... If she sells out a monopoly for a bonus, the robbery upon the citizens is ordinarily still worse, as being paid for and sanctified by a right purchased from government. If the State becomes a partner with a few of her citizens, to the exclusion of others, offering the same terms, it is still a most odious and anti-republican principle, and more worthy of the days of monopoly.

1 *Debates, supra* note 6, at 646. Read would later declare that monopolies were "contrary to the spirit of a free State, and that we ought to make a declaration of that kind in our Bill of Rights." *Id.* at 975. Section 23 was that declaration.

Read's fellow delegates spoke plainly about the object of the provision. His supporters declared that the provision was "intended to prohibit the Legislature from establishing monopolies, or granting special privileges." 2 *Debates, supra,* note 6 at 1395 (remarks of Delegate Pepper of Ohio County); *see also id.* at 1394 (remarks of Delegate Biddle of Cass County) ("[T]he proposition is a plain one, that there shall be no exclusive monopolies—no privileges granted to one man which shall not, *under the same circumstances,* belong to all men.") (emphasis in original). His opponents understood this as well, and they feared that section 23 would prohibit a state bank and severely impair internal improvement projects.[12] Read's opponents lost their fight, however, and section 23 was adopted. It provides as follows: "The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens."

*B. Early Case Law.* Early judicial interpretations of section 23 focused on this "state sponsorship" or "entanglement" conception of the provision. For example, we struck down an attempt by the legislature to extend a special corporate charter granted prior to the adoption of section 23. *In re Application of the Bank of Commerce for Change of Name* (1899), 153 Ind. 460, 53 N.E. 950. In that case the Court condemned the "special privileges and immunities" contained in the charter and invited the corporation to continue its business under the general laws of the state. *Id.* at 474, 53 N.E. at 956.[13] A few years before we had applied section 23 in a slightly broader context by invalidating a city ordinance that exacted a permit fee from nonresident peddlers and from peddlers selling goods manufactured outside the city. *See Graffty v. City of Rushville* (1886), 107 Ind. 502, 8 N.E. 609.

Eventually, section 23 came to be applied even more broadly. We held, for example, that the state could regulate a particular area

---

11. Read originally introduced the equal privileges and immunities language as an addition to our current Article I, section 35. He proposed the following wording:

> The Legislature shall not bestow any title of nobility, nor confer hereditary distinctions, *nor grant to any citizen or class of citizens privileges and immunities which upon the same terms shall not equally belong to all citizens.*

2 *Debates, supra* note 6, at 1391 (emphasis added). The convention first voted to accept the amendment but later reconsidered. *Id.* at 1385–86, 1391–92. Read then introduced the clause as an independent provision. *Id.* at 1393.

12. Delegate Thomas Smith of Ripley County believed that the proposition was "conclusive against the State Bank" and promised to vote against it. 2 *Debates, supra* at 1393. Delegate Alvin P. Hovey of Posey County warned the convention that "if you adopt the resolution as it stands, you will cripple the energies of the State." *Id.* at 1396.

13. *See also Evansville & O. Val. Ry. v. S. Indiana Rural Elec. Corp.* (1953), 231 Ind. 648, 109 N.E.2d 901 (striking down statute allowing certain suppliers of electricity to collect penalties fees).

of commerce so long as the classifications were reasonable in light of the object of the legislation. *Levy v. State* (1903), 161 Ind. 251, 68 N.E. 172. In *Levy,* we held that the State could require transient merchants to acquire licenses before plying their trade. We reasoned that since the statute applied to all transient merchants, a "natural and reasonable" class, it did not privilege a particular business over similarly situated enterprises. *Id.* at 256, 68 N.E. at 174. We also applied section 23 to statutes which did not regulate commerce. *See, e.g., City of Evansville v. State* (1888), 118 Ind. 426, 21 N.E. 267 (residency and political requirements for city employees). We tested statutes against section 23 by asking whether there was "some inherent and substantial difference germane to the subject matter and purpose of the legislation between those included within the class and those excluded." *School City of Elwood v. State* (1932), 203 Ind. 626, 635–36, 180 N.E. 471, 474. The statute must also afford similar opportunity to all persons "who naturally belong to the class." *Id.* at 635, 180 N.E. at 474.

*Section 23 and the Fourteenth Amendment.* This Court's case law features recurring questions about whether section 23 has a life of its own or if it stands only as a relative of the Equal Protection Clause of the Fourteenth Amendment. Despite the distinct histories of the two provisions, this Court has sometimes employed notions from the Fourteenth Amendment of the U.S. Constitution in its section 23 analysis. In *Pittsburgh, C., C. & St.L.Ry. v. Montgomery* (1898), 152 Ind. 1, 9, 49 N.E. 582, 585, for example, we embraced the idea that section 23 is "in effect, the same as the equality clause of the fourteenth amendment to the federal Constitution." *See also Johnson v. St. Vincent Hosp.* (1980), 273 Ind. 374, 404 N.E.2d 585; *Sidle v. Majors* (1976), 264 Ind. 206, 341 N.E.2d 763.

In other cases, we treated section 23 as if it were independent from the Federal Constitution. *Graffty,* 107 Ind. 502, 8 N.E. 609. We have even declared in several cases that the two provisions are antithetical. *See, e.g., Cincinnati, H. & D.Ry. v. McCullom* (1915), 183 Ind. 556, 109 N.E. 206; *Hammer v. State*

(1909), 173 Ind. 199, 89 N.E. 850. In these latter cases, we reasoned that the Equal Protection Clause "prevents the curtailment of constitutional rights," while section 23 "prevents the enlargement of the rights of some in discrimination against the rights of others." *Cincinnati, H. & D.Ry.,* 183 Ind. at 560–61, 109 N.E. at 208.

Whether section 23 stands as a self-contained and independent provision or whether equal protection concepts may be read into section 23 is a question presently before us in the case of *Collins v. Day,* Court of Appeals No. 93A02–9110–EX–449 (Petition for transfer filed Feb. 11, 1993). To resolve the present case, we need not prejudge the outcome of that appeal. The act passes muster under either approach.

■ *C. Section 23 as a Prohibition Against Special Privileges.* We begin by recognizing that an original purpose of section 23 was to prohibit the legislature from granting special privileges to private commercial enterprises. Thus, before we apply the substantive standard of section 23, we must determine if city-wide, rather than county-wide, voting on casino gambling is a grant of a privilege prohibited by this section.

■ The referenda provided for in the riverboat gambling act are intended as a means for the people, rather than the legislature, to determine for themselves whether to invite gambling operations into their communities. Such provision for referenda does not bestow a special privilege upon certain persons seeking gaming licenses, nor does it grant a special privilege to particular landowners across the counties. Simply put, the ability to vote directly does not inherently convey a privilege or impose a burden on persons such as Moseley. Thus, the statute does not contravene section 23.

*D. Section 23 as a Guarantee of Equal Protection.* Appellees' alternative claim assumes that section 23 embodies the equal protection jurisprudence of the Fourteenth Amendment. They argue that the riverboat gambling act impermissibly diluted the voting power of the people of Portage as com-

pared with the franchise of those in the cities of Lake County.

■ Under equal protection analysis, the party challenging a statutory classification must demonstrate that the classification bears no rational relationship to a legitimate state interest. Where the classification is based on suspect criteria or impinges upon a fundamental right, however, the State must show that the classification is required to promote a compelling interest. *Sturrup v. Mahan* (1974), 261 Ind. 463, 305 N.E.2d 877. And while voting is a fundamental right, not all restrictions trigger such strict scrutiny. *Gallagher v. State Election Bd.* (1992), Ind., 598 N.E.2d 510. Appellees ask that we consider their participation in a referendum structured identically to those held in Lake County a fundamental right and apply strict scrutiny.

Our republic holds that all citizens enjoy the right to participate on an equal basis in the political process. Thus, the U.S. Supreme Court has held that the Equal Protection Clause guarantees fairly apportioned electoral districts. *See Avery v. Midland County,* 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968) (local districting); *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (state legislative districting). The Supreme Court has also extended the principle of "one person, one vote" from these apportionment cases to cases in which certain otherwise qualified voters are denied the right to vote in special-interest elections and even some referenda. *See Kramer v. Union Free Sch. Dist. No. 15,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (school board elections); *City of Phoenix v. Kolodziejski,* 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970) (general bond issue referendum). In this last case, Justice White

wrote that "when all citizens are affected in important ways by a governmental decision subject to a referendum, the Constitution does not permit weighted voting or the exclusion of otherwise qualified citizens from the franchise." *Kolodziejski,* 399 U.S. at 209, 90 S.Ct. at 1994.

■ Appellees do not complain, however, that they were denied the right to vote or that the votes were weighted in the Porter referendum. All voters in Porter County were eligible to voice their opinions. Rather, appellees complain that their voting power was diluted in comparison to that of the city residents of Lake County. This does not constitute a voting rights claim under the Equal Protection Clause.

The Supreme Court has expressly refused to "extend[ ] the 'one man, one vote' principle to individuals residing beyond the geographic confines of the governmental entity concerned." *Holt Civic Club v. City of Tuscaloosa,* 439 U.S. 60, 68, 99 S.Ct. 383, 389, 58 L.Ed.2d 292 (1978) (upholding extension of police jurisdiction outside city limits without also extending voting rights); *see also Town of Lockport v. Citizens for Community Action at the Local Level, Inc.,* 430 U.S. 259, 97 S.Ct. 1047, 51 L.Ed.2d 313 (1977) (upholding statute requiring concurrent majority votes in cities and in county before restructuring county government).[14] For purposes of equal protection analysis, then, vote dilution occurs when the voting power of one group is purposely and invidiously reduced as compared to the voting power of others in the political subdivision affected by the vote.

■ The statute in question provides equal participation for persons living within each political subdivision affected by the vote. While the referenda in Porter County,

---

**14.** The Court in *Lockport* noted the "limited relevance" of the equal protection principles employed to ensure equal representation in government to the analysis for "single-shot" referenda. *Lockport,* 430 U.S. at 266, 97 S.Ct. at 1052–53. The Court emphasized that, unlike the apportionment cases where the indirect representation of voters across a variety of legislative issues was at stake, referenda provide voters with the opportunity to express their will directly.

For a discussion of *Holt* and *Lockport, see* Richard Briffault, *Voting Rights, Home Rule, and*

*Metropolitan Governance: The Secession of Staten Island as a Case Study in the Dilemmas of Local Self-Determination,* 92 Colum.L.Rev. 775, 794–802 (1992) (*Lockport* and *Holt* indicate that "the Supreme Court considers the entire issue of local boundary-drawing, with its attendant impact on the scope of the right to vote; to be a matter for the political judgment of state legislatures without federal constitutional limitation or guidance." *Id.* at 800.)

Hammond, and East Chicago all addressed the general subject of riverboat gambling, the impact of each referendum fell only on those eligible to vote in that referendum. Porter County residents voted on whether to allow riverboat gambling in Porter County; residents of Hammond and East Chicago voted on whether to allow riverboat gambling in their respective cities. We hold that appellees do not enjoy a fundamental right to the same voting scheme employed in a different political subdivision on a different proposition.

Even absent a fundamental right to a specific voting scheme, differences in voting rules from county to county must still. be rationally related to a legitimate state interest. In this case, the state has an interest in ensuring votes to those most affected by the introduction of gambling into their communities. With this concern in mind, the legislature could reasonably conclude that the effect of gaming would be greater in smaller counties and structure the referenda accordingly. We appreciate the disappointment of the residents of Portage who favor gaming, but equal protection does not guarantee that the legislature will structure referenda so that they can prevail. *See City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980).

### IV. Conclusion

The statute does not offend either Article I, section 23 or Article IV, section 23 of the Indiana Constitution. The trial court is therefore reversed, and the injunction dissolved.

DeBRULER, DICKSON and SULLIVAN, JJ., concur.

GIVAN, J., dissents with separate opinion.

GIVAN, Justice, dissenting.

I respectfully dissent from the majority opinion in this case. I would hold that the trial court was correct in holding I.C. § 4–33–6–1, *et seq.* unconstitutional.

As pointed out by the majority opinion, there are many reasons why laws that affect only a certain part of the state do not in reality violate the constitutional prohibition against special laws. In the instant case, the majority is correct in observing that the statute is not unconstitutional because it affects only those counties and cities where the use of a riverboat is possible.

However, when such a law is passed, although it does not affect every county in the state in like manner, it must apply equally to those counties affected. *R.R. Comm. of Ind. v. Grand Trunk Western, R. Co.* (1913), 179 Ind. 255, 100 N.E. 852. The provision in the statute that there must be a county-wide referendum in most of the counties affected is most reasonable and quite understandable considering the fact that the presence of a riverboat casino in a county will have county wide ramifications even though it would be docked within the corporate limits of a city within the county.

It is obvious that not only the city but the county will be required to make accommodations for the increase in traffic and the anticipated incidents which will necessitate countywide law enforcement. Anticipated criminal prosecutions which will result from the presence of the riverboat will necessitate an expenditure of taxpayers' funds on a countywide basis. To make an exception of Lake County as to the need for a county-wide referendum is not logical merely because the entire lake front in Lake County is within the corporate limits of cities within the county. This in no way diminishes the cost to the taxpayers county wide in carrying out those governmental functions which will naturally evolve from the presence of the riverboat.

I find no justification in treating the taxpayers of Lake County any differently than the taxpayers of the other counties involved. For the same reasons, I see no justification in treating the City of Gary in a different manner than the other cities in Lake County are treated.

The trial court was correct in declaring the statute to be unconstitutional.