INDIANA STATE TEACHERS ASSOCIA-
TION, Indianapolis Education Associa-
tion, and Joyce Macke, Appellants–
Plaintiffs,

v.

BOARD OF SCHOOL COMMISSIONERS
OF THE CITY OF INDIANAPOLIS,
Appellees–Defendants.

No. 49A02–9604–CV–194.

Court of Appeals of Indiana.

May 6, 1997.

Richard J. Darko, Mary Jane Lapointe, Lowe Gray Steele & Darko, Indianapolis, for Appellants–Plaintiffs.

Michael R. Maine, David K. Herzog, Julie Manning Magid, Baker & Daniels, Indianapolis, for Appellees–Defendants.

Robert D. Macgill, Stanley C. Fickle, Andrew J. Detherage, Barnes & Thornburg, Indianapolis, for Amici Curiae David G. Vanderstel, Sheryl D. Vanderstel, Indianapolis Chamber of Commerce, and City of Indianapolis.

## OPINION

KIRSCH, Judge.

Appellants, the Indiana State Teachers Association, the Indianapolis Education Association, and Joyce Macke, the president of the Indianapolis Education Association and a teacher with the Indianapolis Public Schools (collectively, "Teachers Associations"), appeal the trial court's determination of the constitutionality of Article 20–3.1, as added to the Indiana Code by 1995 House Enrolled Act 1646. The trial court rejected the Teachers Associations' claims that: 1) Article 20–3.1 violates Article IV, § 19 of the Indiana Constitution because it was enacted as part of a legislative bill which was not confined to one subject and matters properly connected therewith; and 2) Article 20–3.1 violates Article IV, § 19 of the Indiana Article 20–3.1 violates Article IV, § 23 of the Indiana Constitution because it is not a general and uniform law.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On February 28, 1995, the Indiana Senate passed Engrossed Senate Bill 256 which provided for the reformation of the Indianapolis Public Schools (IPS). The bill contained limitations on the subject matter of collective bargaining and other provisions that affected IPS teachers. Senate Bill 256 was then sent to the Indiana House of Representatives where it passed on the first and second readings, but was not called for a third reading.

A legislative conference committee, however, appointed to consider differences in the budget bills passed in each house, issued a report which added the contents of former Senate Bill 256 to Engrossed House Bill 1646. The title of House Bill 1646, which now included the contents of former Senate Bill 256, was amended to read "A BILL FOR AN ACT to amend the Indiana Code concerning state and local administration and to make an appropriation." *Record* at 718. The conference committee report on House Bill 1646 was submitted to the House at 10:22 p.m. on April 29, 1995, the final day of the 1995 legislative session. The conference committee report passed both the House and the Senate minutes before midnight on that day. Governor Evan Bayh signed House Bill 1646, including the contents of former Senate Bill 256, into law on May 11, 1995. *See* P.L. 340–1995. P.L. 340–1995 added the contents of former Senate Bill 256 to the Indiana Code as Article 20–3.1.

The Teachers Associations subsequently filed suit in the Marion Superior Court, claiming, among other things, that P.L. 340–1995 is not confined to one subject and matters properly connected therewith in violation of Article IV, § 19 of the Indiana Constitution, and that IC 20–3.1 is not a general law of uniform operation throughout the State in violation of Article IV, § 23 of the Indiana Constitution. The court held a trial on the merits of these issues and found no constitutional violation. The Teachers Associations appeal.

## DISCUSSION AND DECISION

■ When considering the constitutionality of a statute, we accord it every reasonable presumption of validity. *Ledbetter v. Hunter*, 652 N.E.2d 543, 545 (Ind.Ct.App.1995). All doubts are resolved against a challenger who must overcome that presumption by "clearly demonstrating the provision to be invalid." *State v. Hoovler*, 668 N.E.2d 1229, 1232 (Ind.1996).

### I. The Single–Subject Requirement

■ The Teachers Associations claim that P.L. 340–1995 violates Article IV, § 19 of the Indiana Constitution which provides: "An act, except an act for the codification, revision or rearrangement of laws, shall be confined to one subject and matters properly

connected therewith." The purpose of Article IV, § 19 is to establish a check on the exercise of legislative power. Section 19 was included in the Constitution to protect the legislative process against political log-rolling, "where legislators combine two unrelated bills, each without sufficient support to pass on its own, in order to accumulate the requisite number of votes to pass both." *Pence v. State*, 652 N.E.2d 486, 489 (Ind. 1995) (Dickson, J., dissenting); *see also Jackson v. State ex rel. South Bend Motor Bus Co.*, 194 Ind. 248, 252, 142 N.E. 423, 424 (1924) (single-subject requirement designed to prevent "the conjunction, in one act, of two or more subjects having no legal connection, for the purpose of procuring the passage of laws which might not, alone, command legislative sanction, upon the strength of popular measures embraced in the same act.") (quoting *Grubbs v. State*, 24 Ind. 295, 297 (1865)). In order to effectuate the purpose of Section 19, our courts should enforce the single-subject requirement without hesitation. *See Jackson*, 194 Ind. at 251–52, 142 N.E. at 424 ("where it is clear that the law offends a constitutional inhibition, then it is the duty of the courts to uphold the Constitution rather than the statute which is in violation thereof.").

Notwithstanding these pronouncements of the importance of the purposes underlying Section 19, our supreme court has taken a laissez-faire approach to determining whether a violation of the single-subject requirement has occurred. *See, e.g., Dague v. Piper Aircraft Corp.*, 275 Ind. 520, 530–32, 418 N.E.2d 207, 213–15 (1981) (inclusion of Product Liability Act in bill amending Title 33 of the Indiana Code concerning courts and court officers did not offend single-subject requirement).

The wisdom of taking such an approach was criticized by Justice Dickson in *Pence v. State* where, in dissent, he stated:

> "I favor enforcement of this constitutional imperative and believe that Indiana courts should seriously consider claims that enactments violate this requirement.

Particularly in view of the recently renewed commitment of Indiana citizens to the single-subject requirement,[1] courts should henceforth invalidate nonconforming statutory provisions."

*Pence*, 652 N.E.2d at 489. Justice Dickson noted the court's "reluctance to enforce the single-subject-per-act requirement and our resulting implied invitation to the General Assembly to accord minimal attention to the single-subject requirement in our Constitution." *Id.* at 490 (referring to *Dague*, 275 Ind. 520, 418 N.E.2d 207, and *Bright v. McCullough*, 27 Ind. 223 (1866)). Despite Justice Dickson's compelling observations, none of the other justices joined in his dissent. The court's broad approach to analyzing legislative acts for single-subject violations has prevailed, and the implied invitation to the General Assembly remains. *See Bayh v. Indiana State Bldg. and Constr. Trades Council*, 674 N.E.2d 176, 179 (Ind.1996) ("The single subject provisions of the Constitution ... are designed to promote fair practice in legislating without much judicial intervention.").

By joining the IPS legislation with the budget in P.L. 340–1995, the General Assembly again accepted the supreme court's implied invitation. In doing so, the General Assembly passed, as part of the state's budget, legislation which restricts the collective bargaining rights of public school teachers in Indianapolis. This restriction on the rights of the members of the Teachers Associations was joined with the budget after it failed to pass on its own merits. This is the very logrolling that Section 19 of our Constitution was designed to prevent.

The legal connection between the budget of the state and a restriction on the right of IPS teachers to collectively bargain is tenuous at best. Our supreme court, however, has upheld equally tenuous connections in *Dague, supra,* and we are bound to follow such precedent. The legislature has traditionally linked together matters of state and local administration. *See* Indiana Code, Title 5. In accordance with that general scheme,

---

1. Although Article IV, § 19 was amended in 1960 and 1974, Indiana voters retained the single subject requirement for all acts except those "for the codification, revision or rearrangement of laws." *Pence*, 652 N.E.2d at 489.

P.L. 340–1995 contains several provisions relating to budgetary matters which fall under the category of state administration. The law also contains provisions relating to IPS which fall under the category, however loosely, of local administration. To this extent, P.L. 340–1995 contains a single subject, state and local administration, and does not offend Article IV, § 19 of the Indiana Constitution as interpreted by our supreme court.

## II.  The Uniform Law Requirement

Article IV, § 23 of the Indiana Constitution provides that "In all the cases enumerated in the preceding section [Article IV, § 22], and in all other cases where a general law can be made applicable, all laws shall be general, and of uniform operation throughout the State." [2]  IC 20–3.1–1–1 provides that:

"This article applies to a common school corporation that:

(1) is located in whole or in part in the most populous township in a county having a population of more than seven hundred thousand (700,000); and

(2) serves the largest geographical territory of any school corporation in the township."

The law currently applies only to Marion County and IPS.  The Teachers Associations argue that such an exclusive application renders IC 20–3.1 a special law in violation of Article IV, § 23.

■ Analyzing a law under Article IV, § 23 requires that we first determine whether the law is general or special.  If the law is general, we must go on to determine whether it is uniformly applied throughout the state. If the law is special, we must go on to determine whether it is constitutionally permissible.  *See Hoovler,* 668 N.E.2d at 1233; *Indiana Gaming Comm'n v. Moseley,* 643 N.E.2d 296, 301 (Ind.1994).

■ We turn, then, to the question of whether IC 20–3.1 is a general or a special law.  A law is considered general if it "treats all persons alike under the same or similar conditions and circumstances, and the classification is reasonable and naturally inherent in the subject matter." *Dortch v. Lugar,* 255 Ind. 545, 553, 266 N.E.2d 25, 31 (1971).  In *Dortch,* our supreme court upheld the constitutionality of a statute that contained a population classification making the statute applicable only to Marion County.  The court declared that the statute, "by its very terms, is made applicable to any county in which, because of later increased population, there is situated a city of the first class.  The mere fact that no other county presently qualifies does not render the Act unconstitutional." *Id.* (citations omitted).

More recently, the supreme court has called into question population classifications as a basis for determining whether a law is general or special.  In *Hoovler,* 668 N.E.2d 1229, the supreme court considered a law that contained a population classification of more than 129,000, but less than 130,600, making the law applicable only to Tippecanoe County.  Regarding population classifications, the court said: "We acknowledge that some prior cases imply that a law selectively applicable to special locales or circumstances may be deemed to be general if it employs a population restriction to achieve its limited application.  However, the mere presence of a population restriction does not convert an otherwise special law into a general and uniform law." *Id.,* 668 N.E.2d at 1233 n. 3. The dissenters in *Hoovler* disagreed with this shift in position and would have held that "population-based categories ... fulfill the requirements for a valid general law set by a long line of decisions by this court." *Id.* at 1236 (Sullivan, J., and DeBruler, J., dissenting) (citing cases).  In particular, the dissent cited *Dortch,* stating, "What's good for Marion County ought be good for Tippecanoe County." *Id.*[3]

At issue in *Hoovler* was a statute, IC 6–3.5–7–1 to –22, that allowed the Tippecanoe County Income Council to increase tax rates

---

**2.**  There is no contention that IC 20–3.1 falls within any of the categories enumerated in Article IV, § 22.  Accordingly, we will confine our analysis to Article IV, § 23.

**3.**  We note that upholding population classifications as the basis for determining that a law satisfies Section 23 can lead to the opposite conclusion and assure that what is good for Marion County will not apply in Tippecanoe County.

upon finding that funds were necessary for environmental substance removal and remedial action in Tippecanoe County. The majority found that regardless of the population classification, the statute at issue was a special law because it authorized a special tax rate available to only one Indiana county. 668 N.E.2d at 1233. As in *Hoovler*, we conclude that IC 20–3.1 is a special law because it regulates schools in only one Indiana county.

The next question is whether IC 20–3.1 is a constitutionally permissible special law. We look again to *Hoovler* in which the majority upheld the special law's constitutionality. In finding no violation of Article IV, § 23, the court looked beyond the statute's population classification to "other circumstances surrounding [the statute], *including language in the Act itself* [.]" 668 N.E.2d at 1234 (emphasis added).

In *Hoovler*, the court considered the fact that Tippecanoe County contained a landfill that the United States Environmental Protection Agency (EPA) determined was an environmental hazard. Under what is known as federal Superfund legislation, the EPA had identified certain governmental entities in Tippecanoe County as potentially responsible parties regarding the costs to clean up the landfill. The supreme court noted the "staggering" nature of the costs associated with determining the extent of the liability of those potentially responsible parties and that such costs could be "reduced substantially" if the parties entered into a consent decree within a limited time period. 668 N.E.2d at 1235. The court further observed that without the statute's revenue-generating system, the potentially responsible parties would lack the resources to enable them to enter into the consent decree, and the opportunity to reduce the cleanup costs would be lost. *Id.* Based upon these "other circumstances," the court concluded:

"Mindful of the standard of review under which we uphold the constitutionality of statutes whenever reasonably possible, we conclude that permitting increased taxes due to Tippecanoe County's unique exposure to Superfund liability is not a matter necessarily subject to a general law uniformly applicable in all counties. We therefore conclude that [the statute] does not, as a matter of law, violate Article IV, Section 23 of the Indiana Constitution." *Id.*

We see no distinction between the case before us and *Hoovler*. As in *Hoovler*, the language of IC 20–3.1 itself sets forth the circumstances surrounding its enactment:

"20–3.1–3–1 Conditions and needs found to exist

Sec. 1. The following school city conditions and needs are found to exist on January 1, 1995:

(1) Education in the school city presents unique challenges.

(2) Student achievement in the school city on statewide tests consistently has been significantly below:

(A) the state average; and

(B) achievement attained in school corporations adjacent to the school city.

(3) The need for remediation of students in the school city consistently has been significantly higher than:

(A) the state average; and

(B) remediation levels in school corporations adjacent to the school city.

(4) Graduation rates in the school city consistently have been significantly below:

(A) the state average; and

(B) graduation rates in school corporations adjacent to the school city.

(5) Student attendance rates in the school city consistently have been below:

(A) the state average; and

(B) student attendance rates in school corporations adjacent to the school city.

(6) There are individual schools in the school city whose students are achieving. However, overall student achievement in the school city is unsatisfactory.

(7) Improving education in the school city requires unique legislative intervention.

**938**

(8) Educator-driven school level control of efforts to improve student achievement in their schools and a program of performance awards in the school city will encourage the development and use of:

(A) innovative teaching methods;

(B) improved opportunities for teacher professional development;

(C) programs achieving greater levels of parental involvement;

(D) more efficient administrative efforts; and

(E) improved student achievement.

(9) Greater accountability among educators in their schools, including:

(A) evaluations based on student achievement measures and administrative efficiency criteria; and

(B) annual reports to the public regarding student achievement information and administrative performance measures;

will encourage the development and use of creative and innovative educational methods and improve student achievement.

(10) Providing a range of remediation opportunities to students in the school city who fail to meet state achievement standards or who are determined to be at risk of academic failure by the board will enhance the educational opportunities available to students and improve student performance.

(11) Enhanced intervention for schools whose students fail to meet expected performance levels will improve the educational opportunities and educational achievement in the school city.

(12) Allowing students to attend neighborhood schools and the development and implementation of a plan by the board to increase student performance and achievement in the school city are necessary to achieve these legislative objectives and to meet the unique challenges to education and improve student achievement in the school city."

IC 20–3.1–3–1. Based upon the existence of these unique circumstances, the legislature could have reasonably concluded that such circumstances could not be adequately addressed through a general law thereby making a special law necessary. For this reason, we hold that the special law found in IC 20–3.1 is not unconstitutional under Article IV, § 23. *See Moseley,* 643 N.E.2d at 301 (if the subject matter of a legislative act is not amenable to a general law of uniform operation throughout the state, then the act is constitutional under section 23).

Affirmed.

STATON and CHEZEM, JJ., concur in result as to Issue I and concur as to Issue 2.